**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 10 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

ROBERT WILLIAM DESPAIN,

    Plaintiff-Appellant,

v.

JUDY UPHOFF, in her official capacity as Director,
Wyoming Department of Corrections; DUANE
SHILLINGER, in his official capacity as Warden,
Wyoming State Penitentiary; JAMES FERGUSON, in
his official capacity as Deputy Warden, Wyoming State
Penitentiary; RONALD G. RUETTGERS, in his official
capacity as Associate Warden, Wyoming State
Penitentiary; STAN JAMES, in his official capacity as
Security Manager, Wyoming State Penitentiary;
TOMMY BUSTOS, in his official capacity as
Corrections Officer, Wyoming State Penitentiary,

    Defendants-Appellees,

No. 99-8003

Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 95-CV-207-D)

Paul H. Schwartz (Steven G. Sklaver with him on the briefs) of Cooley Godward
LLP, Denver, Colorado, for Plaintiff-Appellant.

Karen Ashcraft Byrne of Cheyenne, Wyoming, for Defendants-Appellees.

Before **TACHA**, Chief Judge, **SEYMOUR**, and **EBEL**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

Robert DeSpain, an inmate of the Wyoming State Penitentiary, appeals from a grant of summary judgment in favor of prison officials in an action he brought pursuant to 42 U.S.C. § 1983 alleging the violation of his Eighth Amendment right to be free from cruel and unusual punishment. Mr. DeSpain based his claims on two separate incidents: the failure by Associate Warden Ron Ruettgers to rectify unsanitary flooding conditions caused by prisoners after a riot, and an unrelated incident two months later in which prison guard Tommy Bustos indiscriminately discharged pepper spray into the unit in which Mr. DeSpain was housed.

The magistrate judge issued a report and recommendation finding that Mr. DeSpain's claims for money damages against defendant prison officials in their official capacities were barred by the Eleventh Amendment. The judge further concluded that injunctive and declaratory relief was improper because Mr. DeSpain had failed to show the events at issue were susceptible to repetition. Finally, the judge concluded Mr. DeSpain had failed to state a claim based on supervisory liability. With respect to Mr. DeSpain's claims against defendants Ruettgers and Bustos individually, the magistrate judge determined these

defendants were entitled to qualified immunity on the ground that Mr. DeSpain had failed to show either defendant's conduct violated the Eighth Amendment. The district court conducted a de novo review and adopted the magistrate's report and recommendation.

On appeal, Mr. DeSpain challenges only the district court's ruling that defendants Ruettgers and Bustos are entitled to qualified immunity based on the court's conclusion that, even accepting Mr. DeSpain's version of the disputed facts, he failed to state an Eighth Amendment violation. We exercise jurisdiction under 28 U.S.C. § 1291, reverse the grant of summary judgment, and remand for further proceedings consistent with this opinion.

# I

## Qualified Immunity

In order to promote the efficient administration of public services, the doctrine of qualified immunity "shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity is an affirmative defense to a section 1983

action, providing immunity from suit from the outset." *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995). Once a defendant asserts qualified immunity as a defense, the plaintiff must carry the burden of showing qualified immunity is not proper under the circumstances. *Id.* To do this, the plaintiff must show that (1) the defendant's conduct violated a constitutional right and (2) the law governing the conduct was clearly established at the time of the alleged violation. *Baptiste*, 147 F.3d at 1255.

We review the legal issues surrounding the grant of qualified immunity de novo, viewing all evidence in the light most favorable to Mr. DeSpain as the non-moving party. *See id.*; *Patrick v. Miller*, 953 F.2d 1240, 1243 (10th Cir. 1992). We turn first to the requirement that the plaintiff show a constitutional violation, and determine whether Mr. DeSpain stated a sufficient claim for violations of his Eighth Amendment rights. As we explain below, Mr. DeSpain presented sufficient facts to support an Eighth Amendment claim stemming from each incident.

### A. Constitutional Violation – Prison Flooding

Mr. DeSpain claims the conditions during an incident of prison flooding were so egregious as to violate his Eighth Amendment right to be free from cruel and unusual punishment. To prevail on a "conditions of confinement" claim

under the Eighth Amendment, an inmate must establish that (1) the condition complained of is "'sufficiently serious'" to implicate constitutional protection, and (2) prison officials acted with "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 302-03 (1991)). In order to satisfy the first requirement, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. With regard to the second requirement, the Supreme Court has explained that "deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Id*. at 835. The Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." *Id*. at 836-37. We apply this standard to the prison flooding situation described by Mr. DeSpain.

Nearly every material fact related to the flooding incident is hotly contested, but in reviewing a grant of summary judgment we consider the material facts as they were alleged by the non-moving party, Mr. DeSpain. Those facts show that Mr. DeSpain was one of several prisoners classified as potentially disruptive who were transferred to administrative segregation after another prisoner was murdered in March 1994. Rec., vol. III, doc. 111, exh. V (DeSpain

Aff.), ¶¶ 2-3.[1]  Several days later, angry at the prison's delay in explaining the transfer, a number of the segregated prisoners plugged their toilets with styrofoam cups and then flushed, resulting in water overflows that left the unit standing in approximately four inches of water.  *Id*. ¶¶ 9-10; doc. 112 (DeSpain Aff.), ¶ 11. The prison shut off water to the toilet system to prevent further flooding and sent guards with video cameras to document the flood.  Doc. 111, exh. V, ¶¶ 11, 13. The tier janitor was ordered to clean the mess, but he refused and quit his job.  *Id.* ¶ 12.

The flooding occurred at approximately 11:30 p.m. on March 28, and the cell unit was ultimately cleaned on the morning of March 30.  *Id*. ¶¶ 9, 24, 25. The toilet system remained off for most of this thirty-six-hour period but was turned on once at around 5:30 p.m. on March 29 so that prisoners could flush their toilets.  *Id*. ¶ 21.  Mr. DeSpain was exposed to the stench of sitting urine in his toilet and attempted to cover the toilet with a plastic bag, which provided little

---

[1] Defendants contend Mr. DeSpain's affidavits should not be relied upon as evidence because certain statements therein contradict his testimony from an earlier deposition.  Conflicts between the sworn testimony in an affidavit and that of a deposition are not automatic grounds for disregarding the affidavit, unless the record suggests the affidavit likely was introduced merely to create a "sham fact issue" for purposes of summary judgment. *Hollins v. Delta Airlines*, 238 F.3d 1255, 1259 n.1 (10th Cir. 2001).  Defendants do not identify any specific contradictions, and only a few pages of the deposition transcript were included in the record on appeal.  Moreover, the district court did not address any argument that the affidavits were a sham and, in fact, relied on them in its order.  We therefore rely on the affidavits in deciding this appeal.

remedy. *Id.* ¶ 28. Wishing to avoid the same problem, many prisoners eschewed the toilets altogether and urinated through the bars of their cells into the standing water in the walkways. *Id.* ¶¶ 15, 17; doc. 112, ¶ 18. Mr. DeSpain describes hearing prisoners urinate into the water and seeing feces floating amidst other debris in the water near his cell. Doc. 112 ¶¶ 19, 23.

The prisoners were served breakfast on the morning of March 29, with officers rolling the food cart through the urine-mixed water. *Id.* ¶ 20. The cart's ground clearance was roughly the same as the water depth, making it difficult to avoid contact between the food and the contaminated water. *Id.* Food trays were not picked up after lunch service, and at future meals the officers merely kicked the trays out of their way, adding uneaten and partially eaten food to the standing water. Doc. 111, exh. V, ¶¶ 18-19. At supper service, the officers began wearing rubber boots to protect themselves from the mess. *Id.* ¶¶ 20, 22.

Repulsed by the conditions and fearful of food contamination, Mr. DeSpain avoided eating during the course of the flood. *Id.* ¶ 26. He spent nearly the entire period "confined to [his] bed in [his] cell as if it was an island because it was the only dry area in [his] cell." *Id.* ¶ 27. During lunch service on March 29, he asked a guard if he might clean the tier and his own cell, and the guard responded that no one was to clean, "by orders of [Associate Warden] Ron Ruettgers." Doc. 112, ¶¶ 26-27. Mr. DeSpain describes hearing similar requests from other prisoners,

who received the same response. *Id.* ¶ 36. Finally, at mid-morning on March 30, Ron Ruettgers announced there would be no canteen privileges until the tier was clean. Doc. 111, exh. V, ¶ 24. Prisoners responded by "[y]elling obscenities and also that they had been trying to clean it for Two Days." *Id.* Two prisoners were asked to clean the tier, and they did so immediately. *Id.* ¶ 25.

Mr. DeSpain began to suffer psychological distress in the aftermath of the flooding situation. Doc. 112, ¶¶ 99-123. Prison psychiatrists diagnosed him with anxiety and prescribed an anti-anxiety medication. *Id.* ¶ 100. He remained on the medication for several months and eventually replaced the drug therapy with religious techniques for mental discipline. *Id.* He alleges that his anxiety continues to the present day. *Id.* ¶ 119.[2]

**"Sufficiently Serious" Conditions**

The first requirement is that the conditions complained of must be

---

[2] The magistrate's report correctly noted that "[u]nder current law, no claim for mental distress can be brought absent some accompanying claim of physical injury. 42 U.S.C. § 1997e(e). However, plaintiff brought this action prior to the effective date of 42 U.S.C. § 1997e(e). His claim for mental distress alone remains cognizable." Rec., vol. III, doc. 126 at 6 (citing *Cunningham v. Eyman*, 11 F. Supp.2d 969, 972-73 (N.D. Ill. 1998)). *See also Craig v. Beberly*, 164 F.3d 490 (10th Cir. 1998) (section 1997e(e) not applied retroactively). On a more general level, this court has held that "the Eighth Amendment may be implicated not only [by] physical injury, but also by the infliction of psychological harm." *Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001).

"sufficiently serious" to implicate constitutional rights. *Farmer*, 511 U.S. at 834. The Eighth Amendment's prohibition on cruel and unusual punishment "'does not mandate comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'" *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In order to satisfy this prong of the *Farmer* test, a prisoner must show that conditions were more than uncomfortable, and instead rose to the level of "conditions posing a substantial risk of serious harm" to inmate health or safety. *Farmer*, 511 U.S. at 834.

The standard described in *Farmer* reflects a balance between judicial respect for the exigencies of running a prison, *see Rhodes*, 452 U.S. at 351, and the "broad and idealistic concepts of dignity, civilized standards, humanity and decency" embodied in the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). *See also Penrod v. Zavaras*, 94 F.3d 1399, 1405 (10th Cir. 1996) (per curiam). The analysis should not be based on "a court's idea of how best to operate a detention facility." *Rhodes*, 452 U.S. at 351. At the same time, Eighth Amendment protections "draw [their] meaning from the evolving standards of decency that mark the progress of a maturing society," a lofty standard. *Id*. at 346. This requires that prison officials "provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to

guarantee the inmates' safety." *Craig v. Eberley*, 164 F.3d 490, 495 (10th Cir. 1998) (quoting *Barney*, 143 F.3d at 1310).

An inquiry into conditions of confinement by necessity relies on the particular facts of each situation; the "circumstances, nature, and duration" of the challenged conditions must be carefully considered. *Johnson v. Lewis*, 217 F.2d 726, 731 (9th Cir. 2000). While no single factor controls the outcome of these cases, the length of exposure to the conditions is often of prime importance. For example, "[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978). We have held that a situation involving filthy cells, poor lighting, inadequate ventilation or air cooling, and unappetizing food "simply [did] not rise to the level of a constitutional violation" where prisoners were exposed to the conditions for only forty-eight hours. *Barney*, 143 F.3d at 1312 (listing cases in which a few days spent in unsanitary conditions did not violate the Eighth Amendment). In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while "substantial deprivations of shelter, food, drinking water, and sanitation" may meet the standard despite a shorter duration. *Johnson v. Lewis*, 217 F.2d at 732; see also *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994) ("the length of time required

-10-

before a constitutional violation is made out decreases as the level of filthiness endured increases").

Because the flooding conditions described by Mr. DeSpain lasted only thirty-six hours, he must allege significant deprivations in order to state a successful conditions of confinement claim. Accepting his portrayal of the flooding conditions, we hold that he has done so. The gravamen of Mr. DeSpain's complaint is that the lack of access to working toilets led to his exposure to other inmates' urine and feces via the standing water and also to close confinement with the odor of his own accumulated urine. While there is "no doubt that toilets can be unavailable for some period of time without violating the Eighth Amendment," *Johnson v. Lewis*, 217 F.2d at 733, exposure to human waste carries particular weight in the conditions calculus. *See McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) (finding "sufficiently serious conditions of confinement" where inmate in feces-covered cell for three days); *see also Johnson v. Lewis*, 217 F.2d at 733; *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990) ("courts have been especially cautious about condoning conditions that include an inmate's proximity to human waste"); *Michaud v. Sheriff of Essex County*, 458 N.E.2d 702, 705-06 (Mass. 1983) (listing cases showing "an intolerance for confinement which requires persons to live in close proximity to their own human waste and that of others"). Exposure to human waste, like few other conditions of

-11-

confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment. *See McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir. 1991) ("unquestionably a health hazard" to live in "filthy water contaminated with human waste"); *Fruit*, 905 F.2d at 1150-51 ("common sense" that "unprotected contact with human waste could cause disease"); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (three days in cell with feces smeared on walls not within "civilized standards, humanity, and decency"); *LaReau v. MacDougal*, 473 F.2d 974, 978 (2nd Cir. 1972) ("Causing a man to live, eat, and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted."). Accordingly, the conditions described by Mr. DeSpain meet the first prong of the *Farmer* test.

**Official Knowledge of Conditions**

The second, subjective portion of the *Farmer* test requires that prison officials show "deliberate indifference" to the existence of any risk inherent in exposure to the challenged conditions. As the Supreme Court explained this requirement:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

-12-

*Farmer*, 511 U.S. at 837. This awareness requirement exists because "prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment" in a manner that violates the Eighth Amendment. *Id*. at 844. On the other hand, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate," as long as the official should have understood the possibility that harm might ensue. *Id*. at 842. The test requires both knowledge and disregard of possible risks, a *mens rea* on a par with criminal recklessness. *Id*. at 836. If an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability under this standard. *Farmer*. 511 U.S. at 844; *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995).

Whether an official had "the requisite knowledge of a substantial risk" and ignored that risk is a question of fact. *Farmer*, 511 U.S. at 842. Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence. *Id*.; *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 809-10 (10th Cir. 1999). Although, in general "[i]t is not enough to establish that the official *should* have known of the risk of harm," *Barney*, 143 F.3d at 1310 (emphasis added), in some cases "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 842.

In considering Mr. DeSpain's claims, the district court noted the challenged conditions arose "in the context of a disturbance in a prison" and accordingly applied a higher standard requiring that he show officials acted "maliciously or sadistically for the very purpose of causing harm." Rec., vol. III, doc. 134 at 6. This standard was developed in *Whitley v. Albers*, 475 U.S. 312 (1986). *Whitley* involved a claim of cruel and unusual punishment brought by a prisoner who was shot accidentally while prison officials attempted to restore order during an inmate rebellion. Although the widespread uprising had already ended, "a guard was still held hostage, [one inmate] was armed and threatening, several other inmates were armed with homemade clubs, numerous inmates remained outside their cells, and the cellblock remained in control of the inmates. The situation remained dangerous and volatile." *Id*. at 322-23. The Supreme Court reasoned that in the context of a prison disturbance, the deliberate indifference standard does not adequately reflect officials' need to balance competing considerations of general health and safety and the more acute threats to inmates and staff presented by the disturbance itself, nor does it "convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Id*. at 320. The Court concluded that "[w]hen the ever-present potential for violent confrontation and conflagration ripens into *actual* unrest and conflict," *id*. at 321 (citation omitted), the proper

question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm," *id*. at 320-21 (internal quotation omitted).

On first analysis, *Whitley*'s "malicious and sadistic" standard, which considers the *excessive use of physical force* by prison officials in response to disturbances, would not appear relevant to Mr. DeSpain's conditions of confinement claim. The "very high state of mind" required by that standard "does not apply to prison conditions cases." *Farmer*, 511 U.S. at 836. Instead, conditions of confinement claims require only a showing of "deliberate indifference." *Id*.; *MacKay*, 48 F.3d at 493. At the same time, when the conditions of confinement exist in conjunction with a prison riot, the balancing considerations described in *Whitley* generally are present. Officials securing an unsafe situation cannot be expected to provide the same level of comfort demanded under normal circumstances. Thus the Ninth Circuit has found that the "exigent circumstances" faced by prison officials during a riot require use of the higher *Whitley* standard. *Johnson v. Lewis*, 217 F.2d at 734. As soon as the inmates are secure and present "no further danger to prison staff, the public, or each other," however, there is no longer a need for officials to "make split-second, life-and-death decisions." *Id*. Without this time pressure and need to balance competing safety considerations, the standard in the aftermath of a

-15-

disturbance immediately reverts back to *Farmer's* "deliberate indifference." *Id.*

Viewing the facts in the light most favorable to Mr. DeSpain, as we must at this juncture, it is by no means clear that there was an ongoing threat to safety during the prison flooding. While Mr. DeSpain admits that the prisoners were often unruly during the period in question, shouting threats and obscenities at the guards, they remained locked in their cells. A janitor was ordered to clean immediately after the flooding, and prison guards regularly entered the unit to serve meals as well as to videotape the conditions, belying defendants' assertion that taking measures to relieve the situation would have been unsafe under the circumstances. Thus, Mr. DeSpain's claims should have been considered under the "deliberate indifference" standard.

While Mr. DeSpain originally brought claims against a variety of prison officials, he appeals the grant of summary judgment regarding the flooding only as it relates to his claim against Associate Warden Ron Ruettgers, who was in charge of the administrative segregation unit during the incidents in question. We thus view the evidence presented to determine whether it stated sufficient allegations of deliberate indifference on the part of Mr. Ruettgers. Mr. DeSpain describes only one direct link to Mr. Ruettgers' control of the prison's response to the flooding, the guard's assertion that no one was allowed to clean "by orders of Ron Ruettgers." Rec., vol. III, doc. 111, exh. V, ¶ 18. He also alleges the rubber

boots worn by guards were issued by Mr. Ruettgers. *Id.*, doc. 112, ¶ 42. Moreover, the guards reported to Mr. Ruettgers, and it appears they were well aware of conditions related to the flooding. Mr. DeSpain describes inmates asking the guards how they felt about walking in "piss water," and the guards began wearing rubber boots soon after. It is also common sense to expect there *would* be waste management problems if inmates were left for thirty-six hours with a single toilet flush. Considering Mr. Ruettgers' responsibility for the cell block, we cannot conclude as a matter of law that he did not show deliberate indifference to the health risks presented by the flooding and lack of sanitation.

Mr. DeSpain has proffered sufficient facts to show that the cell block flooding led to deprivations serious enough to implicate Eighth Amendment protections and that Associate Warden Ruettgers may have shown deliberate indifference to the health risks inherent in the conditions. While defendants challenge Mr. DeSpain's allegations of the severity of the situation and of Mr. Ruettger's knowledge, those factual disputes must be left to the province of an appropriate factfinder. This claim should not have been dismissed on summary judgment.

**B. Constitutional Violation – Pepper Spray**

We next consider Mr. DeSpain's Eighth Amendment claim against Officer

Tommy Bustos stemming from an occasion in which Officer Bustos sprayed capstun, or pepper spray, indiscriminately along the prison tier. The district court applied the *Farmer* conditions of confinement test to this claim and granted summary judgment to Officer Bustos, reasoning that Mr. DeSpain failed to state a claim upon which relief might be granted because pepper spray "is generally of limited intrusiveness" and does not present "a substantial risk of serious harm." Rec., vol. III, doc. 134, at 7-8. Considering *Farmer*'s subjective component, the district court further concluded that Mr. DeSpain "failed to show . . . that Officer Bustos knew of and disregarded an excessive risk of harm." *Id*. at 8. After reviewing the record on the pepper spray claim and applying what we believe to be the correct legal standard, we reverse the district court's grant of summary judgment.

The facts surrounding the pepper spray incident are largely undisputed. While walking along the tier in which Mr. DeSpain was housed, Officer Tommy Bustos held his can of pepper spray behind his back and discharged it for about seven seconds into the tier at large. After exposure to the spray, Mr. DeSpain suffered "burning skin and lungs with congested breathing and tearing eyes." *Id.*, doc. 112, ¶ 63. He washed his eyes and skin with water in his cell, *id*. ¶ 71, and he requested oxygen from a nurse brought in to administer medical treatment but was refused, *id*. ¶ 73. There is only one disputed material issue – whether Officer

-18-

Bustos sprayed the tier accidentally or deliberately. Mr. DeSpain relates that after the incident, Officer Bustos said he had discharged the pepper spray as "an act of humor." *Id.* ¶ 78. He was allegedly seen laughing after the incident. *Id.* ¶ 65. For the purposes of summary judgment, we will accept the allegation that the act was done deliberately as a practical joke.

The legal analysis for this claim does not fall neatly into any one category of Eighth Amendment cases. The claim presents a mirror image of the flooding analysis: while it may be tempting to apply the *Farmer* test for conditions of confinement as the district court did, we are convinced it is more appropriate to apply the *Whitley* standard for excessive use of force. On one hand, *Farmer* could be applicable because, by spraying pepper spray into the air of the tier, Officer Bustos created a general "condition" that affected the environment surrounding the tier's occupants. The conditions analysis also seems appropriate because there was no need for Officer Bustos to weigh competing safety concerns or to restore order in the face of a disturbance. However, pepper spray is an instrument with which prison officers wield their authority, or force, and thus its use implicates the excessive use of force. Just as the *Whitley* standard for excessive use of force is inappropriate for analyzing conditions cases, "'application of the deliberate indifference standard is inappropriate' in one class of prison cases: when 'officials stand accused of using excessive physical

force.'" *Farmer*, 511 U.S. at 835 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). The fact that there was no disturbance under these circumstances determines not which standard should apply, but whether the use of force was justified. Accordingly, we apply the *Whitley* standard and ask whether Officer Bustos acted "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21.

Assuming Officer Bustos discharged the spray as a practical joke, this test is easily met. "[I]t is necessary for us to balance the need for application of force with the amount of force used." *Mitchell v. Maynard*, 80 F.3d 1433, 1440 (10th Cir. 1996). Accepting Mr. DeSpain's allegations as true in this case, Officer Bustos' act of spraying the tier indiscriminately with pepper spray was not a good faith effort to maintain or restore order in the tier. It was not warranted at all. "Where no legitimate penological purpose can be inferred from a prison employee's alleged conduct . . ., the conduct itself constitutes sufficient evidence that force was used 'maliciously and sadistically for the very purpose of causing harm.'" *Giron v. Corrections Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999) (quoting *Whitley*, 475 US. at 320-21). We will not require inmates to be subjected to the malicious whims of prison guards. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("When prison officials maliciously and sadistically use force to

cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident.”).

Mr. DeSpain does not allege any significant physical harm from exposure to the pepper spray. We note that, in general, “[d]e minimis applications of force are necessarily excluded from the cruel and unusual punishment inquiry.” *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992). “Not every push or shove, even if it may later seem unnecessary in the peace of a judge’s chambers, violates a prisoner’s constitutional rights.” *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1972). However, “the ultimate constitutional inquiry is directed at whether an ‘unnecessary and wanton infliction of pain’ has occurred,” *Northington*, 973 F.2d at 1523. If so, there is no need for a plaintiff to allege significant and lasting injuries. *Id*.; *see also Hudson*, 503 U.S. at 9. Mr. DeSpain alleges that he suffered burning eyes and lung congestion as a result of the pepper spray and ongoing anxiety thereafter, enough to withstand the test for excessive use of force. Consequently, the district court erred in holding that Mr. DeSpain failed to state a constitutional claim against Officer Bustos.

### C. Clearly Established Rights

We next turn to the second requirement in the qualified immunity inquiry and consider whether the rights in question were clearly established when the

events occurred in 1994. In order for a particular constitutional right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The key to the analysis is notice – an official somehow must be on notice that the conduct in question could violate the plaintiff's constitutional rights. There need not be precedent declaring the exact conduct at issue to be unlawful, as long as "the alleged unlawfulness was apparent in light of preexisting law." *Seamons v. Snow*, 84 F.3d 1226, 1238 (10th Cir. 1996) (quoting *Hilliard v. City & County of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991)); *see also Anderson*, 483 U.S. at 640. In analyzing whether a particular right is clearly established, we examine the law as it existed at the time of the challenged actions to determine whether "there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains," *Medina v. City & County of Denver*, 960 F.2d 1493, 1497-98 (10th Cir. 1992). The facts of previous decisions need not correlate exactly with those of the case at issue, as long as there is "some factual correspondence" between the two. *Hidahl v. Gilpin County Dep't of Social Servs.*, 938 F.2d 1150, 1155 (10th Cir. 1991); *Medina*, 960 F.2d at 1497.

Although neither the Supreme Court nor this circuit had addressed claims

alleging exposure to sewage by the time these events took place in 1994, our discussion above includes opinions from a variety of courts expressing society's unwillingness to tolerate conditions that require an inmate to live in close proximity to human waste. Our recent decision in *McBride*, 240 F.3d 1287, which held a prisoner stated a conditions of confinement claim after being confined in a feces-covered cell for three days, postdates the flooding situation at issue here by several years. However, *McBride* relied almost entirely upon the Second Circuit's 1972 statement that "[c]ausing a man to live, eat, and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted." 240 F.3d at 1292 (quoting *LaReau*, 473 F.2d at 978). In viewing the great weight of cases set out above condemning on constitutional grounds an inmate's exposure to human waste, a reasonable prison official would have known at the time that it was improper to expose prisoners to such unsanitary, offensive conditions. We therefore hold the law was "clearly established" at the time of the flooding and Ron Ruettgers' claim of qualified immunity must fail at this juncture.

Few cases have discussed the use of pepper spray in any detail, and so the parties dispute whether the law prohibiting Officer Bustos' unfounded use of pepper spray was clearly established in 1994. The magistrate's report determined it was not, concluding that, "[w]hile use of chemical agents in subduing prisoners

is subject to significant restrictions, plaintiff guides us to no precedent which requires us to find clearly established law that a *general* discharge of pepper spray violates Eighth Amendment rights." Rec., vol. III, doc. 126, at 16. We disagree. Cases addressing the use of chemical agents against a single individual are sufficiently analogous to a general discharge of pepper spray to constitute clearly established law.

The district court relied upon two cases finding pepper spray to be of "limited intrusiveness," but those cases were decided after the events in question and are easily distinguished because the pepper spray had been used in response to genuine threats by prisoners. Rec., vol. III, doc. 134, at 7 (citing *Griffin v. City of Clanton*, 932 F. Supp. 1359, 1369 (M.D. Ala. 1996), and *Healy v. Pena*, 1996 WL 708595, at *7-8 (N.D. Cal. 1996)). We have found no case discussing the use of pepper spray in a truly analogous situation, although one opinion has held that chemical agents like tear gas "become instruments of brutality when used indiscriminately against a defenseless prisoner." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

In the end, we believe this issue can be decided based not upon the specific characteristics of pepper spray but upon the requirement that an excessive use of force occur "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21. This standard was already well established in 1994

and was easily met by Officer Bustos' actions. As the Supreme Court explained in applying *Whitley*, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant inquiry is evident." *Hudson*, 503 U.S. at 9. At this stage of the proceedings, when we assume Officer Bustos acted deliberately as a practical joke, his claim of qualified immunity must fail.

## II

For the foregoing reasons, we **REVERSE** the grant of summary judgment against Mr. DeSpain and **REMAND** the case for further proceedings in the district court.