WOOD, Circuit Judge,
concurring in the judgment.
Civilized societies do not condone torture committed by governmental agents, no matter what job title the agent holds. I am confident that every member of this court would agree with that proposition. This is therefore a case of system failure: plaintiffs Donald Vance and Nathan Ertel assert that representatives of the U.S. government (who happened to be members of the Armed Forces) subjected them to a variety of measures that easily qualify as “torture,” whether under the definitions *206 found in the Army Field Manual, international law, or legislation such as the Torture Victim Protection Act, 28 U.S.C. § 1350 note, § 3(b). This shameful fact should not be minimized by using euphemisms such as the term “harsh interrogation techniques.” The question before us is whether the man who served as Secretary of Defense at the time of the plaintiffs’ ordeal, Donald Rumsfeld, is entitled to qualified immunity in the suit they have brought against him. Although I part company in substantial ways from the majority’s reasoning, I conclude that former Secretary Rumsfeld himself is entitled to such immunity. The same may well be true of others who had no personal participation in these events. Nevertheless, I am in substantial agreement with Judge Hamilton’s dissenting opinion when it comes to the question of possible liability for those who actually committed these heinous acts. I therefore am able only to concur in the court’s judgment.
I
The majority’s account in Part I of the underlying facts, which it properly presents in the light most favorable to Vance and Ertel, provides the essential information for deciding the case. But I find its characterization of the facts to be incomplete in one important respect. In my view, “threats of violence and actual violence, sleep deprivation and alteration, extremes of temperature, extremes of sound, light manipulation, threats of indefinite detention, denial of food, denial of water, denial of needed medical care, yelling, prolonged solitary confinement, incommunicado detention, falsified allegations,” as well as “prolonged exposure to cold, intolerably loud music, ‘hooding,’ ‘walling,’ ” and the like, must be acknowledged for what they are: torture. Ante at 196. In other cases, we might need to draw a line between harsh techniques and actual torture, but that is not a problem here. It is notable that courts have found that comparable actions also violate the Eighth Amendment to the U.S. Constitution, for prisoners, or the Due Process Clauses, in the case of pretrial detainees and others not facing punishment. See, e.g., Wilson v. Seiter, 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (holding that conditions of confinement may establish an Eighth Amendment violation in combination, even if each would not suffice alone; this would occur when they have “a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise”); DeSpain v. Uphoff, 264 F.3d 965, 974 (10th Cir.2001) (concluding that exposure to human waste for 36 hours would constitute a deprivation serious enough to violate the Eighth Amendment).
Like the majority, I conclude that we are authorized in this appeal to consider the question whether the plaintiffs have stated a claim against the Secretary. I have nothing to add to its analysis in Part II of its opinion. In particular, I agree with the majority that the panel correctly ruled that 5 U.S.C. § 701(b)(1)(G) forecloses plaintiffs’ claims against the United States. I therefore proceed directly to explain my disagreement with Part III of the majority’s opinion, and my agreement with the ultimate conclusion of Part IV (and thus with the ultimate decision to reverse the judgment of the district court).
II
In Part III of its opinion, the majority tackles the broad question “whether to create an extra-statutory right of action for damages against military personnel who mistreat detainees.” Ante at 198. Almost every part of this phrasing of the issue needs closer examination. Although *207 in a literal sense, the cause of action recognized in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), might be called “extra-statutory,” that does not mean that the claim sprang forth from the heads of federal judges. It was solidly rooted in the most fundamental source of law we have, the Constitution, and in particular the Fourth Amendment. The lawsuit fell comfortably within the boundaries of the federal-question jurisdiction Congress has conferred in 28 U.S.C. § 1331. To expand Vance’s and Ertel’s case to one that involves any and all possible claims against military personnel is, as Judge Hamilton has persuasively shown, neither necessary nor wise. Had Vance and Ertel known from the start the identity of their tormenters, and had they sued only those people, we might have a very different reaction to the issues presented. I consider it premature at best to assume that a civilian in the state of Texas who is dragged by a military officer onto the grounds of Fort Hood and then tortured would not have a Bivens cause of action against that officer. Although the majority stresses that the events in our case occurred in a “combat zone,” even that is not entirely accurate. In fact, plaintiffs were removed from the active combat zone and placed into a military prison — critically, a place where there was plenty of time to make considered decisions and enemy forces were nowhere to be seen. Finally, the phrase “mistreat detainees” wrongly implies possible liability for a broader range of injury than the plaintiffs are asserting (or at least than I would be prepared to recognize). More than simple mistreatment is at stake here. We are talking about conduct that the international community recognizes as torture and that lies at the extreme end of that which would support a finding of Eighth Amendment liability in a suit brought by a domestic prisoner.
Rather than starting — and ending — with Secretary Rumsfeld, the majority inexplicably starts at the bottom of the military hierarchy. It makes the obvious point that if the lowest private and her immediate commanders have done nothing wrong, then the lieutenants, captains, colonels, generals above her, including ultimately the Secretary of Defense, would similarly have no liability for that private’s actions. But why start there? It is a fallacy to think that the converse of this is true: that just because the Secretary has done nothing wrong, then none of the people inferior to him can have erred. The majority acknowledges just this point in Part IV of its opinion, ante at 204-05. Cases are legion where a warden is exonerated even though prison guards are liable; where a school superintendent has no liability even though a principal does. See, e.g., Lojuk v. Quandt, 706 F.2d 1456 (7th Cir.1983) (Veterans Administration staff psychiatrist may be liable for performing electroshock therapy on patient without consent, but supervisor is not); Lenz v. Wade, 490 F.3d 991 (8th Cir.2007) (officers liable for beating inmate, but warden is not); Baynard v. Malone, 268 F.3d 228 (4th Cir.2001) (principal and teacher liable for teacher’s sexual abuse of student, but superintendent and personnel director are not).
The majority has written with a broad brush with respect to those lower down in the chain of responsibility, and it does not seem to have drawn any distinction between the obviously culpable actors and those whose involvement may have been more indirect. But perhaps it has: in the end I cannot tell whether the majority intends to preclude Bivens liability even for the direct actors. Either way, I find the gist of the majority’s discussion troubling. The Court has seen many cases *208 raising questions about abusive police, military, or prison guard tactics. In the police and prison contexts, the Court has affirmatively recognized the availability of Bivens actions. See Bivens; Carlson v. Green, 446 U.S. 14, 19, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). And the majority passes over without comment the Bivens cases that have come before the Court at the certiorari stage over the years. Although we all know that a denial of certiorari in itself does not convey any message — either approval or disapproval — we know equally well that the Court does not hesitate to step in and correct lower courts that have strayed beyond the boundaries it has established. It has done just this in case after ease in the habeas corpus area. See Overstreet v. Wilson, 686 F.3d 404, 410-11 (7th Cir.2012) (Wood, J., dissenting) (listing cases reversing grants of habeas corpus relief and noting the use of summary reversals in this area). The Court has not sent such clear signals in the Bivens Eighth Amendment context, even as it has issued decisions such as Minneci v. Pollard, — U.S. —, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012), which declined to make a Bivens remedy available against employees of a private prison facility. Had the Court wished to disapprove Bivens actions altogether, it would not have taken the trouble in Minneci to review the history of Bivens and decide on which side of the line the proposed claim fell.
The Court’s acceptance of Bivens in the closely related area of the Eighth Amendment is consistent with both Congress’s actions and the position of the Executive Branch. The majority brushes over the fact that the Detainee Treatment Act expressly provides a defense to a civil action brought against a member of the Armed Forces or any other agent of the U.S. government for engaging in practices prohibited by that law. What suit? Congress can have been referring only to a Bivens action. It did much the same thing when it passed the Westfall Act of 1988, which went out of its way to state that the substitution of the United States for a federal employee for purposes of the Federal Tort Claims Act “does not extend or apply to a civil action against an employee of the Government ... which is brought for a violation of the Constitution of the United States.” 28 U.S.C. § 2679(b)(2). Although it is theoretically possible that Congress was just underscoring its understanding that no such suit was possible, that is a strained reading of the statutory language, and it is a reading that some scholars have rejected. See James E. Pfander and David Baltmanis, Rethinking Bivens: Legitimacy and Constitutional Adjudication, 98 Georgetown L.J. 117, 132-38 (2009) (arguing that Congress “joined the Court as a partner in recognizing remedies in the nature of a Bivens action [based on] the Westfall Act’s preservation of suits for violation of the Constitution and [on] the considerations that led to its adoption.”).
Moreover, as Judge Hamilton notes, the State Department relied on the availability of Bivens actions when it filed answers to a number of questions posed by the United Nations committee with oversight responsibility over the Convention Against Torture (CAT). Question 5 pointed out that the United States had taken the position that the CAT was not self-executing, and it asked for a specification of how the United States proposed to meet its obligations under the Convention. The State Department provided a lengthy response, which in relevant part read as follows:
Finally, U.S. law provides various avenues for seeking redress, including financial compensation, in cases of torture and other violations of constitutional and statutory rights relevant to the Conven *209 tion. Besides the general rights of appeal, these can include any of the following, depending on the location of the conduct, the actor, and other circumstances:
* * *
• Bringing a civil action in federal or state court under the federal civil rights statute, 42 U.S.C. § 1983, directly against state or local officials for money damages or injunctive relief;
• Seeking damages for negligence of federal officials and for negligence and intentional torts of federal law enforcement officers under the Federal Tort Claims Act, 22 U.S.C. § 2671 et seq., or of other state and municipal officials under comparable state statutes;
• Suing federal officials directly for damages under provisions of the U.S. Constitution for “constitutional torts,” see Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979);
See United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (Apr. 28, 2006) (Question 5), available at http://www. state.gov/g/dr]/rls/68554.htm (last visited Oct. 30, 2012). I do not know whether the State Department will feel compelled to inform the Committee that it was in error with respect to its Bivens/Davis representation in light of the majority’s opinion, but there is no ambiguity in what it said.
The last point the majority makes in Part III is that, in their view, the plaintiffs’ citizenship should not be dispositive either way. If we were writing on a clean slate, then I would enthusiastically endorse that sentiment. The problem is that the background statutes — not to mention international law — are replete with distinctions based on citizenship. Thus, the Torture Victim Protection Act, 28 U.S.C. § 1350 note, provides a remedy to any “individual,” but only against “[a]n individual” who acts “under actual or apparent authority, or color of law, of any foreign nation.” Id., § 2(a). The Alien Tort Statute, 28 U.S.C. § 1350, covers only “any civil action by an alien for a tort only....” (Emphasis added.) Principles of legislative jurisdiction in international law recognize authority based not only on territory, but also on nationality. See Restatement (Third) of Foreign Relations Law of the United States, § 402, which provides that subject to certain reasonableness limitations, “a state has jurisdiction to prescribe law with respect to ... the activities, interests, status, or relations of its nationals outside as well as within its territory.” Id. § 402(2). In fact, if it were true that there is no Bivens theory under which a U.S. citizen may sue an official of the U.S. government (including a military official) who tortures that citizen on foreign land under the control of the United States (including its military), then U.S. citizens will be singled out as the only ones without a remedy under U.S. law. That is because existing law permits a U.S. citizen to sue a foreign official, and an alien can sue anyone who has committed a tort in violation of the law of nations. Only by acknowledging the Bivens remedy is it possible to avoid treating U.S. citizens worse than we treat others. The fear of offense to our allies that the majority fears dissipates as soon as we look at the broader picture.
Ill
I turn finally to Part IV of the majority’s opinion, in which it concludes that Secretary Rumsfeld cannot be held liable to Vance and Ertel no matter what one says about other military personnel and civilians who work for the armed forces. *210 Here the majority properly reserves a critical question. Vance and Ertel, it notes, “do not contend that [Secretary Rumsfeld’s] policies authorized harsh interrogation of security detainees, as opposed to enemy combatants.” Ante at 205. Thus, it concludes, “[t]he extent to which untenable directives, policies, and regulations may support awards of damages can safely be postponed to another day.” Ante at 205. I wholeheartedly endorse this statement.
With that said, I conclude, along with the majority, that the Supreme Court’s decision in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), governs our decision here. In Iqbal, the Court concluded that the Attorney General’s knowledge of and participation in the mistreatment of the plaintiff was remote enough that he could not be held vicariously liable for the actions of his subordinates. The same must be said of Secretary Rumsfeld. This is not because his leadership of the Department of Defense had nothing to do with the plaintiffs’ injuries. His approval of the so-called harsh techniques may have egged subordinates on to more extreme measures — measures that surely violated the standards of the Detainee Treatment Act of 2005, as well as broader norms such as those in the CAT. But the link between their mistreatment and the Secretary’s policies authorizing extreme tactics for enemy combatants is too attenuated to support this case.
IV
In closing, I wish to stress that I do not rest any part of my analysis on the fear that Bivens liability would cause Cabinet Secretaries to carry out their responsibilities with one eye on their wallets, rather than for the greater good of their department and the country. The majority suggests as much in several places, see ante at 200, 202-03, but I find this disrespectful of both the dedication of those who serve in government and the serious interests that the plaintiffs are raising. The majority’s suggestions derive from comments the Court has made over the years in its qualified immunity decisions, where it has considered the question whether personal liability for constitutional torts might “dampen the ardor of all but the most resolute ... in the unflinching discharge of their duties.” Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir.1949) (Learned Hand, J.)); see also Butz v. Economou, 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (highlighting “public interest in encouraging the vigorous exercise of official authority”); Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (noting that “permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.”). But, as the Court has also acknowledged, that concern represents only one side of the balance. Otherwise, it would have adopted a rule of absolute immunity for government actors, in place of the qualified immunity it chose. Bivens, and its counterpart for state actors, 42 U.S.C. § 1983, rest on the countervailing fact that the threat of personal liability for violations of clearly established rules gives some teeth to the need to conform to constitutional boundaries. Courts must balance the risk of over-deterrence against “the public interest in deterrence of unlawful conduct and in compensation of victims.” Harlow, 457 U.S. at 819, 102 S.Ct. 2727; see also Carlson v. Green, 446 U.S. 14, 21, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (“It is almost axiomatic that the threat of damages has a deterrent effect, *211 surely particularly so when the individual official faces personal financial liability.”) (internal citation omitted). While I recognize the need to avoid over-deterrence, I see nothing in this case that requires us to depart from the “balance that [the Supreme Court’s] cases [traditionally] strike between the interests in vindication of citizens’ constitutional rights and in public officials’ effective performance of their duties” through qualified immunity. Anderson, 483 U.S. at 639, 107 S.Ct. 3034.
Finally, I add that our decision here spells the practical end to this case. This is certainly true with respect to the “John Doe” defendants. The two-year statute of limitations that we apply in Bivens cases has long since run, and we do not permit relation back under Federal Rule of Civil Procedure 15(c)(1)(C) where the plaintiff simply did not know whom to sue. See, e.g., Hall v. Norfolk So. Ry. Co., 469 F.3d 590, 597 (7th Cir.2006); King v. One Unknown Federal Correctional Officer, 201 F.3d 910, 914 (7th Cir.2000); see generally 6A Charles Alan Wright et al, Federal Practice and Procedure § 1498.3 (3d ed. 2010).
I therefore respectfully concur only in the judgment of the court.