FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 14, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

JUDY LYNN PRINCE, administrator of
the estate of Wayne Bowker, deceased,

     Plaintiff - Appellant,

v.

No. 20-7056

SHERIFF OF CARTER COUNTY, in his
official capacity; MILTON ANTHONY, in
his individual capacity; DANNY
RENKEN, Deputy; CHESTER CARTER,
Deputy; JESSE MCDANIELS, Sergeant;
KIMBERLY MILLER; JOHN DOES 1-10,
Doctors; JOHN DOES 1-10, Nurses,

    Defendants - Appellees.
_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:18-CV-00201-RAW)**
_____

Robert M. Blakemore (Daniel Smolen and Byron D. Helm, with him on the briefs),
Smolen & Roytman, Tulsa, OK, for Plaintiff – Appellant.

Wellon B. Poe, Jr. (Ambre C. Gooch and Jamison Whitson, with him on the briefs),
Collins, Zorn & Wagner, P.C., Oklahoma City, OK, for Defendant – Appellee Sheriff of
Carter County.

James L. Gibbs, II (Seth D. Coldiron, with him on the briefs), Goolsby, Proctor, Heefner
& Gibbs, P.C., Oklahoma City, OK, for Defendant – Appellee Kimberly Miller.
_____

Before **TYMKOVICH**, Chief Judge, **LUCERO**, Senior Circuit Judge, and **MORITZ**,
Circuit Judge.

-1-

_____

**LUCERO**, Senior Circuit Judge.

_____

Wayne Bowker died at the Carter County Jail on June 30, 2016, while awaiting trial for a drug possession charge. In the days and weeks preceding his death, Bowker did not receive several of his prescribed medications, experienced fecal incontinence and catatonia, and was able to communicate with jail staff only by using strange repetitive phrases. Despite Bowker's alarming condition, jail officials failed to provide any medical attention in the nineteen days leading up to his death. His mother Judy Prince, the administrator of his estate, brought this action under 42 U.S.C. § 1983 alleging violations of the Eighth and Fourteenth Amendments to the United States Constitution, and other claims.

This appeal considers whether the district court properly granted summary judgment on qualified immunity grounds to jail nurse Kimberlee Miller in her individual capacity and whether it properly granted summary judgment to the Sheriff of Carter County in his official capacity. We conclude that a reasonable jury could determine that Miller violated Bowker's clearly established constitutional right by acting with deliberate indifference toward his psychosis, fecal incontinence, and catatonia. In addition, a reasonable jury could conclude that Carter County's failure to medically train jail employees, adequately staff the jail, and provide timely medical attention caused Bowker's death. Thus, exercising jurisdiction under 28 U.S.C. § 1291, we **REVERSE** the district court's grants of summary judgment.

**I**

**A**

Wayne Bowker was booked into the Carter County Jail ("CCJ") on March 23, 2016, for possession of cocaine.[1]  During the booking process, he informed jail staff that he suffered from numerous serious medical conditions, including asthma, congestive heart failure, high blood pressure, bipolar disorder, anxiety disorder, seizures, shortness of breath, and thyroid problems.  Bowker's medical intake questionnaire also indicated that he was prescribed medication for his cholesterol and blood pressure.  Pursuant to jail

---

[1] At the outset, we address Prince's motion to file certain exhibits in the appendix under seal.  In a supplement to her motion, Prince indicated that the exhibits were only filed under seal to comply with the district court's protective order and argued that none of the exhibits should remain under seal in this court.  Appellees filed a joint response, agreeing to the unsealing of certain documents but not others.

With respect to the documents they wish to keep under seal, Appellees have not met their heavy burden of articulating a real and substantial interest that overcomes the presumption of public access to judicial records.  See Eugene S. v. Horizon Blue Cross Blue Shield of N.J., 663 F.3d 1124, 1135 (10th Cir. 2011); Williams v. FedEx Corp. Servs., 849 F.3d 889, 905 (10th Cir. 2017).  The disputed documents contain the jail's official policies, jail entry logs, and excerpts from the Oklahoma State Bureau of Investigation (OSBI) Report.  Although Appellees contend that disclosure of these documents would pose security concerns and reveal information regarding inmates who are not parties to this litigation, Appellees have not demonstrated that redaction is impracticable or insufficient to address these concerns.  See 10th Cir. R. 25.6(B).  In addition, the content of many of the proposed sealed exhibits is discussed elsewhere in unsealed portions of the record and even the parties' briefs.  While Appellees repeatedly assert that the OSBI Report is confidential pursuant to Oklahoma statute, Okla. Stat. tit. 74, §§ 150.5 (D)(1)-(2) (2014), multiple excerpts of the Report, which are highly relevant to this litigation, were filed publicly in the unsealed appendix.  Accordingly, Prince's motion to file certain exhibits in the appendix under seal is **DENIED**.  Appellees are directed to publicly file the sealed documents within thirty days and may redact only information that poses security or privacy concerns.

policy, officers reviewed this questionnaire with Bowker, without further health assessment at the time of his booking.[2]  Although CCJ's Policies and Procedures Manual required inmate medical care to be delivered under the direction of a licensed physician, CCJ did not consistently employ a licensed physician.  During the times relevant to this appeal, the only jail employee who had any medical training was Appellee Kimberlee Miller.

Miller worked as a nurse at CCJ five days a week from 8:00 a.m. to 4:00 p.m.  If medical problems occurred when Miller was not at work, corrections officers were instructed to ask dispatch employees to contact her by text message.  Occasionally, it took two or three calls before she would respond.  Miller was known to yell at staff when contacted outside of work hours, a problem so pervasive that even the Sheriff was aware that officers were hesitant to contact Miller when she was off duty.  The record reflects that, when finally reached, Miller would call the jail and make a health assessment by phone without seeing the inmate experiencing the health issue.  If an inmate required emergency medical treatment when communication with Miller was infeasible, detention officers with no medical training were expected to rely on their "common sense" to determine whether an inmate should be transferred to the emergency room.

---

[2] Detention officers responsible for inmate booking at CCJ received no formal medical training beyond CPR certification.  A former booking officer testified in another case involving the death of a CCJ inmate that her training consisted of a jail standards class, during which officers were provided an answer key to review before completing a test.  Another officer testified in that case that he received his CPR certification at the jail after writing down answers to a test that were read aloud to him by an instructor from the Southern Oklahoma Ambulance Service.

Even when on site, Miller testified that, as a nurse, she was unqualified to make medical diagnoses. She had no specific mental health training, and CCJ did not employ any mental health staff. Miller testified that she did not regularly conduct "rounds" to check on inmates, even among those housed in the medical unit. According to Miller, she had conversations with the Sheriff's office about whether it would be helpful to have a licensed physician "come in." Despite the lack of trained medical staff at CCJ, the Sheriff's office made limited efforts to employ a licensed physician even though it was required to do so in order to be in accord with its policies.

**B**

Bowker submitted his first medical request to Miller on April 13, 2016. He complained that his breathing was stopping at night and his hands and feet were swelling, that he had suffered from these ailments his whole life, and that he did not have his medication or a continuous positive airway pressure ("CPAP") machine. An attached note from Bowker's cellmate emphasized the severity of the situation—"we are afraid he is going to die on us." Miller did not review this request until two days later, at which point she indicated on the request form that she would call Bowker's family to procure a CPAP machine. She did not conduct a health assessment of Bowker at the time.

On April 16, 2016, Bowker's mother delivered the CPAP machine and prescription medications to the jail. Yet, jail staff refused to accept the medication because CCJ had a policy of refusing any medication that was not packaged in bubble packs. If an inmate's family did not provide medication in this specific type of packaging, an inmate could only obtain medication through a visit to the emergency

-5-

room, which resulted in a $100 transport fee deducted from the inmate's commissary account pursuant to a policy created by the Sheriff's office. These policies applied to all prescriptions even though CCJ's policies required the jail to provide life-sustaining medication. Miller admitted in a deposition that some of Bowker's prescriptions were for life-sustaining medications, but CCJ's medication logs reflect that he did not receive any medication until May 13, close to two months after arriving at CCJ. Moreover, Bowker could only use the CPAP machine at night if he slept on the dayroom floor, as there were no electrical outlets in his cell.

Between May 18 and June 11, 2016, Bowker was transported to the emergency room three times. On May 18, Bowker was admitted to Mercy Hospital on account of a rash. Hospital staff recommended follow-up care within one week, noting "of course [Bowker needs] a primary care physician for complete care and evaluation." The record does not reflect that CCJ ever arranged follow up care for Bowker with a primary care physician. On May 28, Bowker submitted his second medical request to Miller, complaining of a broken toe and difficulty balancing. She did not review this request until June 6, nine days later. This delay was not uncommon. Miller regularly took one or two weeks to respond to inmate medical requests, and a former jail employee testified that the Sheriff was aware of these delays. Having received no response to his May 28 request, Bowker submitted another request on June 3. He reiterated his balancing problems, noting that he was experiencing dizzy spells and had fallen twice, resulting in a back injury. Again, jail paperwork reflects this request was not reviewed until June 6.

Bowker was transported to the emergency room for a second time on June 5, more than a week after submitting his initial medical request and before either request was reviewed by Miller. When medics arrived at CCJ, Bowker was in a wheelchair and unable to stand due to weakness in his legs. At the hospital, a doctor concluded Bowker's symptoms were likely a side effect of his medication and directed a reduced Zyprexa dosage. In the discharge paperwork, Bowker's treating physician emphasized the need for follow-up care outside of the emergency room—"I have explained that if [Bowker does] not have routine and prompt follow up, then [he] may suffer permanent disability, pain and possibly death"—and specifically recommended seeing a psychiatrist.

Bowker was returned to the emergency room for a third time on June 11, after reporting leg pain and difficulty walking. The doctor who saw Bowker indicated in his notes that he was confused by his condition and it was possible that the observed symptoms were psychosomatic. Emergency room records reflect that hospital staff were under the mistaken impression that Bowker would be released within ten days. It appears from the record that jail employees did not advise hospital staff of this error. Bowker's discharge papers directed that he be seen by a neurologist as soon as he was released from jail, and the hospital provided contact information for a neurologist with directions to call in one day. His after-visit summary paperwork listed three medications that Bowker should continue taking: Levothyroxine, Metoprolol Tartrate, and Olanzapine.

Despite clear instructions from the hospital to obtain follow-up neurology care and continue Bowker's course of medications, CCJ provided no further medical care to Bowker after his June 11 hospital visit. Moreover, CCJ's medication logs reflect that he

received three prescribed medications for the last time on June 11 and June 12, including

Levothyroxine and Metoprolol prescriptions that were specifically listed in his hospital

discharge paperwork.  Bowker's condition rapidly deteriorated over the following

nineteen days leading up to his death.

Jail medical records for this period are sparse, but deposition testimony and later

reports indicate that Bowker's behavior became abnormal and alarming.  He defecated on

himself daily for at least a week.  Officers relocated Bowker to H Block, a wing of the

jail designated for inmates with special needs, because he was "laying around and

defecating on himself."  In H Block, Bowker slept on a concrete slab without benefit of a

bed or mat.  On either June 28 or 29, he began to stand in place and stare catatonically at

guards.  During this period, he refused to eat or move, failed to respond to verbal

communications, and kept repeating "I can't" when asked to sit down.

Miller was on vacation during some of this period.  It is unclear from the record

precisely when she left, but it is clear that Bowker was in H Block on her return.  She

spoke to Bowker on June 29 and asked why he had been defecating on himself and

refused to eat and move.  Bowker responded, "I can't.  I can't."  At this point, Bowker

had been laying in one place for so long that he had bruising on his shoulder.[3]  An officer

gave Bowker a shower, and Bowker repeated the phrase, "I can't.  I'm stuck, I'm scared."

When Miller provided a toothbrush, he refused to brush his teeth, stating, "Water is going

---

[3] Miller testified that she did not recall observing bruising, but another officer
testified that he observed bruises on Bowker.  Notes from the OSBI's interview with
Miller indicate that Bowker had bruising on his shoulder at the time she spoke to him.

to run over.  Water is going to run over."  Guards then carried Bowker to a different jail block where he was placed in a cell by himself.  According to Prince's expert medical witness, a prudent layperson should have recognized Bowker's state of mental derangement based on these unusual behaviors.[4]

According to CCJ's Emergency Medical Care Plan, a sudden onset of bizarre behavior is deemed an emergency.  Yet at no point on June 28 or 29 did CCJ staff transport Bowker to an emergency room or otherwise provide medical care.  Rather than contacting a physician or taking Bowker's vital signs, Miller called the judge assigned to his criminal case.  Miller testified that she decided to call the judge because Bowker "needed to be someplace besides in our jail," neglecting to recognize her authority—and obligation under CCJ's own emergency policies—to have Bowker transported to the emergency room or another medical treatment facility.  The judge told Miller that Bowker appeared normal at a court proceeding on June 21.  Miller took no additional action to treat Bowker or seek emergent care following this conversation.

At 1:02 a.m. on June 30, an officer conducting a site check observed Bowker sitting on the toilet in his cell.  By the next site check at 2:09 a.m., Bowker was found collapsed on the floor unresponsive.  Officers performed CPR and called an ambulance, but it was too late.  Emergency room doctors pronounced Bowker dead at 2:55 a.m.  The pathology by the Office of the Chief Medical Examiner declared his immediate cause of death as cardiomegaly, or enlarged heart.  Prince's expert medical witness opined that

---

[4] Miller dismissed Bowker's symptoms on the basis that they were consistent with his bipolar disorder, a mental health assessment she knew she was unqualified to make.

Bowker's cause of death was multifactorial, with severe acute psychosis causing an acute encephalopathy, or brain disease.

## C

As relevant to Prince's unofficial policy or custom claim, we are pointed to incidents that occurred at the CCJ in the preceding years, 2013, 2014, and 2015. In the first of these cases, Jet Jefferson, a diabetic inmate, died in custody in June 2013 after an administration of insulin by Miller. Prior to his death, Jefferson had gone without insulin for unreasonable periods of time.

In the second, Bradley Weaver, another diabetic inmate, suffered a hyperglycemic episode and died in custody in April 2014. Three days prior to his death, Weaver submitted a medical request to Miller complaining that he had been vomiting and dry heaving. According to the request, Weaver was not receiving his diabetes medication. The only action taken by Miller in response was calling Weaver's mother to request that she bring his medication in bubble packaging. Weaver was not taken to the emergency room until days later, after he urinated on himself, repeatedly fell, and stopped breathing.

Finally, Michael Manos, an inmate with bipolar disorder and high blood pressure, died in custody in November 2015 under circumstances similar to Bowker's death. About a week after arriving at the jail, Manos began refusing medication and food and was moved to a medical cell. In his new cell, Manos experienced fecal incontinence and smeared feces on himself and his cell. Jail staff called an ambulance after Manos began eating his feces, but the EMTs determined Manos was faking his mental illness and decided not to transport him. Three days later, Manos was discovered dead in his cell,

covered in feces.  The Sheriff at the time of Manos' death testified that he could not

remember whether he investigated Manos' passing and that he took no steps to determine

whether the jail had an adequate medical delivery system.  In the seven months that

passed between Manos' and Bowker's deaths, the only action the Sheriff took with

respect to the CCJ medical system was asking the jail administrator to direct Miller to

monitor inmate medication logs more closely.  Miller testified she was not asked to do

anything different following Manos' death.[5]

**D**

Prince sued several defendants, including Miller in her individual capacity and the

Sheriff of Carter County in his official capacity, under § 1983 alleging deliberate

indifference in violation of the Eighth and Fourteenth Amendments.[6]  The district court

granted Miller's motion for summary judgment on qualified immunity grounds, finding

no constitutional violation.  Prince v. Sheriff of Carter Cnty., No. CIV-18-201-RAW,

2020 WL 5638819, at *7 (E.D. Okla. Sept. 21, 2020).  And because it found no

---

[5] Manos' mother filed a lawsuit under § 1983 against the former Sheriff of Carter County and two jail deputies in their individual capacities, as well as against the Sheriff in his official capacity.  Bennett v. Carter Cnty. Bd. of Cnty. Comm'rs, No. CIV-17-289-SPS, 2019 WL 1671979 (E.D. Okla. Apr. 17, 2019).  In a decision issued three years after the facts relevant to Prince's case, a magistrate judge granted summary judgment on qualified immunity grounds to the individually named defendants but denied summary judgment with respect to the official capacity claim against the Sheriff.  Id. at *16.  Following Bowker's death and Miller's deposition in the Manos litigation, the current Sheriff terminated Miller's employment, stating that he had lost confidence in her.

[6] Prince also brought claims for unconstitutional conditions of confinement, negligence, and punitive damages below, but she has waived these claims on appeal.

underlying constitutional violation, the district court then granted the Sheriff's motion for summary judgment on Prince's official capacity claim. Order Granting Defendant Sheriff of Carter County's Motion for Summary Judgment, Prince, No. CIV-18-201-RAW (E.D. Okla. Sept. 21, 2020), ECF No. 169 (citing Emmett v. Armstrong, 973 F.3d 1127, 1139 (10th Cir. 2020) ("When a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation – i.e., the first step of the qualified immunity analysis – a finding of qualified immunity precludes the imposition of municipal liability.")).[7]

## II

We review the grant of summary judgment on qualified immunity grounds de novo. Lance v. Morris, 985 F.3d 787, 793 (10th Cir. 2021). Summary judgment is only appropriate when, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in their favor, the movant establishes that there is no genuine dispute of material fact and that the movant is entitled to judgment as

---

[7] The district court also granted summary judgment in favor of Appellees Deputy Chester Carter, Deputy Danny Renken, Sergeant Jesse McDaniels, and former Sheriff Milton Anthony. Order Granting Defendants Danny Renken, Chester Carter, and Jesse McDaniels' Motion for Summary Judgment, Prince, No. CIV-18-201-RAW (E.D. Okla. Sept. 21, 2020), ECF No. 167; Order Granting Defendant Milton Anthony's Motion for Summary Judgment, Prince, No. CIV-18-201-RAW (E.D. Okla. Sept. 21, 2020), ECF No. 168. Although all four Appellees were listed in Prince's notice of appeal, Prince presented no argument regarding the orders granting their motions for summary judgment in her brief. Appellees Anthony, Carter, McDaniels, and Renken subsequently filed an unopposed motion for dismissal by summary disposition in this court. Because Prince has waived her appeal of the relevant orders, the motions for dismissal by summary disposition of Appellees Anthony, Carter, McDaniels, and Renken are **GRANTED**.

a matter of law.  Sawyers v. Norton, 962 F.3d 1270, 1282 (10th Cir. 2020); Fed. R. Civ.

P. 56(a).

## A

We begin by addressing Prince's claims against Miller.  In a defendant's assertion

of a defense of qualified immunity, the burden shifts to the plaintiff to show:  (1) a

violation of a constitutional right, and (2) that the right was clearly established.  Lance,

985 F.3d at 793 (citation omitted).  The district court granted summary judgment to

Miller on the grounds that Prince failed to meet her burden with respect to both prongs of

the qualified immunity test.  We disagree.

In the first prong of qualified immunity, we ask whether Prince has raised a

genuine dispute of material fact such that a reasonable jury could find a violation of her

son's constitutional rights.  Specifically, Prince asserts that Miller violated Bowker's

rights under the Eighth and Fourteenth Amendments.  Courts have long held that a prison

official's deliberate indifference to a convicted prisoner's serious medical needs

constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Estelle

v. Gamble, 429 U.S. 97, 104 (1976); Strain v. Regalado, 977 F.3d 984, 989 (10th Cir.

2020).  Pretrial detainees like Bowker are entitled to the same standard of medical care

under the Due Process Clause of the Fourteenth Amendment.  Bell v. Wolfish, 441 U.S.

520, 535 n.16 (1979); Strain, 977 F.3d at 989 (citing Garcia v. Salt Lake County, 768

F.2d 303, 307 (10th Cir. 1985)).  Therefore, Miller violated Bowker's constitutional

rights if she acted with deliberate indifference toward his medical conditions.

In considering whether the plaintiff was treated with deliberate indifference, we consider the objective severity of the harm suffered as well as the subjective mental state of the defendant with respect to such harms. Strain, 977 F.3d at 989. The objective component examines whether the medical condition or harm claimed by the inmate was "sufficiently serious" to be cognizable under the Cruel and Unusual Punishment Clause. Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009). Our subjective component analysis then considers whether the defendant knew of and disregarded the serious risk to the inmate's health. Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005). In other words, the focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk of that harm.

**1**

The objective component inquiry is whether Prince alleges a "sufficiently serious" harm. A medical condition is "sufficiently serious" when "the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Al-Turki v. Robinson, 762 F.3d 1188, 1192-93 (10th Cir. 2014) (quotation omitted). Deliberate indifference toward an inmate's risk of death certainly satisfies this standard. Martinez, 563 F.3d at 1088-89. The district court concluded that:

> the objective component is satisfied, but with caveats. This prong is satisfied if the defined harm (as claimed by plaintiff) is death, which is 'sufficiently serious' to satisfy this prong . . . . The court finds plaintiff has not satisfied the objective component under the 'intermediate harm' analysis because the symptoms Mr.

Bowker presented upon initial booking and during his incarceration did not put jail employees on notice that Mr. Bowker would suffer death.

Prince, 2020 WL 5638819, at *6.[8]

Bowker's psychosis, fecal incontinence, and catatonia, all of which were raised in the complaint, rise to a level of seriousness sufficient to satisfy the objective prong of the deliberate indifference standard.  See Mata, 427 F.3d at 753 ("Of course, a prisoner must be careful in selecting what harm to claim.  The prisoner may be better off claiming some intermediate harm rather than the last untoward event to befall her.").  Viewing the evidence in the light most favorable to the plaintiff, Bowker's symptoms were sufficiently serious that a layperson could have easily recognized his need for medical attention.  See Al-Turki, 762 F.3d at 1192-93.[9]  Clearly, some jail employees recognized exactly that.  Bowker was relocated to an isolated cell in the days leading up to his death, defecated on himself, and needed to be cleaned by guards.  When Miller and other jail staff attempted to speak with Bowker, he responded with strange phrases instead of communicating normally.  He stayed in place for so long that there was visible bruising

---

[8] The district court proceeded to conclude that Bowker's death did not satisfy the subjective prong of the deliberate indifference standard.  For the reasons discussed below, we disagree, and hold that Bowker's symptoms satisfy both the objective and subjective prongs.

[9] In addition, Bowker's "condition [had] been diagnosed by a physician as mandating treatment."  Al-Turki, 762 F.3d at 1192.  The physicians who saw Bowker at the emergency room mandated follow-up care with a primary physician, psychiatrist, and neurologist in his discharge paperwork, specifically noting that Bowker risked death if not given access to these services.  Despite these instructions, Bowker received no follow-up care.  Notwithstanding the confusion by the treating physicians regarding when Bowker would be released from jail, their written discharge instructions were clear that Bowker required follow-up care.

on his shoulder. Another inmate reported to the OSBI that Bowker appeared to be in a "catatonic state." According to Prince's medical expert, a layperson would recognize that a catatonic person was having a medical emergency.

The district court determined that these harms were insufficiently serious because it would not have been obvious to a layperson that his symptoms could lead to death. Yet because we conclude that Bowker's earlier symptoms should prompt a layperson to seek immediate medical attention, the risk of death was an incorrect inquiry. See Al-Turki, 762 F.3d at 1192-93 ("A medical need is considered sufficiently serious to satisfy the objective prong if the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." (quotation omitted)); Lance, 985 F.3d at 800 (This court has "not required a life-threatening condition to trigger a constitutional duty to provide adequate medical care." (citing McCowan v. Morales, 945 F.3d 1276, 1293-94 (10th Cir. 2019))); see also Foelker v. Outagamie County, 394 F.3d 510, 513 (7th Cir. 2004) (determining that prisoner experiencing hallucinations and defecating on himself presented evidence of a serious medical need). Bowker's symptoms were sufficiently serious to satisfy the objective component of deliberate indifference.

Even if we considered Bowker's psychosis, fecal incontinence, and catatonia as insufficiently serious harms, his condition would yet meet the objective component of the deliberate indifference standard under the "intermediate harm" analysis. We have said that the determination of whether a medical need is sufficiently serious need not be exclusively based on the symptoms observed by prison officials. Mata, 427 F.3d at 753.

-16-

For purposes of meeting the objective inquiry, the detainee may claim to have suffered a resulting harm (such as heart damage) as a consequence of an intermediate harm or symptoms (such as chest pains). Id. Under this approach, the focus of the objective prong is the resulting harm. As long as the resulting harm is sufficiently serious and prison officials ignored the intermediate symptoms, the objective prong is satisfied. Id. It is undisputed that Bowker's ultimate harm of death was sufficiently serious for purposes of the objective component of deliberate indifference. See Martinez, 563 F.3d at 1088-89. Additionally, Prince has presented expert evidence indicating that Bowker's symptoms (the intermediate harms which were ignored by Miller) became lethal as a result of the delay in providing medical attention. See Mata, 427 F.3d at 754. Therefore, a jury could find that Prince also prevails under the "immediate harm" theory of the objective analysis.

In sum, viewing the evidence in the light most favorable to the plaintiff, Miller has not established that she is entitled to judgment as a matter of law with respect to whether Bowker's symptoms of psychosis, fecal incontinence, and catatonia satisfy the objective component. A reasonable jury could certainly determine that Bowker's symptoms were sufficiently serious both on their own and when considered as an intermediate harm that ultimately resulted in Bowker's death.

**2**

In analyzing the subjective component of deliberate indifference, we consider "evidence of the prison official's culpable state of mind," and are satisfied when the record evidence establishes that the "official knows of and disregards an excessive risk to

inmate health or safety." Id. at 751 (quotation omitted).  An official's state of mind can be inferred from circumstantial evidence.  DeSpain v. Uphoff, 264 F.3d 965, 975 (10th Cir. 2001).  "[I]n some cases a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id. (quotation omitted). The district court concluded below that the subjective prong was not satisfied because Miller believed Bowker's symptoms were consistent with his bipolar disorder and therefore not serious.

However, viewing the evidence in the light most favorable to the plaintiff, as we must, the record reflects that Miller both knew of and disregarded a serious risk to Bowker's health.  As we have explained, Bowker's symptoms were so obvious that even a layperson would have recognized his need for medical treatment, even disregarding the discharge instructions of the treating physicians.

When Miller spoke to Bowker on June 29, he communicated using only incoherent phrases.  He had been moved to an isolated cell due to his fecal incontinence, the evidence of which was all around him, and Miller could not have concluded that his symptoms were merely the result of bipolar disorder or that he was malingering.  She knew she was unqualified to render psychiatric diagnoses, and she knew that Bowker had submitted multiple medical requests and been taken to the emergency room three times since arriving at the jail.  One of the medical requests reflected another inmate's concern that Bowker might die.  Bowker's records placed Miller on notice that follow-up medical treatment was urgent.  She received doctors' orders that he see a neurologist, a psychiatrist, and a primary care physician.  One emergency room doctor even noted that

Bowker risked death if he was not provided follow-up medical treatment.  Miller knew that a previous inmate, Michael Manos, had died in confinement seven months earlier upon exhibiting similar symptoms.

Despite being on notice of the severity of Bowker's symptoms, Miller made no effort to order that Bowker be transported to a hospital.  She failed to follow the jail's Emergency Medical Care Plan, which classified a sudden onset of bizarre behavior as a medical emergency.  See Mata, 427 F.3d at 757 (violations of internal prison procedures "certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm").  The only action Miller took following her interaction with Bowker was to call his criminal court judge.  She testified that she made this phone call because she believed Bowker needed to be removed from the jail, but proceeded under the mistaken impression that the pending legal proceedings bore on her responsibility as a medical professional to provide lifesaving care.  Upon our review of the record as a whole, we entertain no doubt that Miller disregarded a serious risk to Bowker's health.

As the administrator of Bowker's estate, Prince has presented sufficient evidence to allow a reasonable fact finder to consider the objective and subjective components of deliberate indifference.  Prince has carried her burden of proof on both components and the district court should not have granted summary judgment to Miller.

**3**

Our next inquiry in the qualified immunity analysis with respect to Miller is whether the constitutional right at issue was clearly established.  Lance, 985 F.3d at 798-

99. "A constitutional right is clearly established if all reasonable jail [officials] would have understood that their conduct had violated the Constitution." Id. "[T]he salient question is whether the state of the law at the time . . . provided fair warning to the defendants that their alleged conduct was unconstitutional." Crowson v. Washington County, 983 F.3d 1166, 1178 (10th Cir. 2020) (cleaned up). "[F]or the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Id. (quotation omitted).

Several Tenth Circuit cases clearly establish that deliberate indifference to symptoms such as those described above violates the Constitution. In Sealock v. Colorado, 218 F.3d 1205, 1211-12 (10th Cir. 2000), we reversed summary judgment in favor of a physician's assistant at a prison who failed to transport an inmate experiencing chest pains to the hospital. We held that the inmate's chest pain, which ultimately resulted in a heart attack, was sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Id. at 1210. In addition, the subjective prong was satisfied because the physician's assistant failed to fulfill his role as a gatekeeper to other medical personnel by exhibiting deliberate indifference toward the inmate's condition. Id. at 1211-12. The physician's assistant knew that his role in the prison was to connect inmates to medical professionals who could provide additional medical attention, just as Miller understood in the present case. See id.

Two years later, in Olsen v. Layton Halls Mall, 312 F.3d 1304 (10th Cir. 2002), we held that a police officer who allegedly ignored an arrested man's panic attack was

-20-

not entitled to qualified immunity on the arrestee's deliberate indifference claim. Id. at 1315-17. Like Bowker, the plaintiff in Olsen suffered from a mental health condition—in that case, obsessive-compulsive disorder ("OCD")—and required medication for this condition. Id. at 1310-11. Olsen alleged that he experienced a panic attack while being transported to a jail, and an officer ignored his need for medical attention. Id. In affirming denial of summary judgment on qualified immunity grounds, we emphasized that a jury could certainly determine that an OCD-related panic attack was sufficiently serious under the objective prong of deliberate indifference. Id. at 1316. Because the record contained conflicting evidence with respect to the officer's subjective awareness of the plaintiff's condition, summary judgment was precluded. Id. at 1317.

In Al-Turki, 762 F.3d 1188, we affirmed denial of qualified immunity to a prison nurse who failed to provide medical attention to a diabetic inmate suffering from abdominal pain and nausea that resulted in kidney stones. Id. at 1194. Our decision specifically rejected the nurse's argument that the law was not clearly established because previous Tenth Circuit deliberate indifference cases involved longer periods of delay and more serious conditions than kidney stones. Id. We held "that a deliberate indifference claim will arise when 'a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency.'" Id. (quoting Self v. Crum, 439 F.3d 1127, 1232 (10th Cir. 2006)).

Finally, in McCowan, 945 F.3d 1276, we affirmed the denial of qualified immunity on a deliberate indifference claim to a police officer who delayed an arrestee's access to medical care for shoulder pain. Id. at 1291-93. The plaintiff in that case was

offered no treatment despite suffering significant pain as a result of re-injuring a hurt shoulder while being tossed around unbuckled in a police vehicle. Id. at 1280-81. We relied on Olsen (and Sealock, to a lesser extent) to hold that the officer's deliberate indifference to McCowan's shoulder pain amounted to a clearly established constitutional violation. Id. at 1292-93.

The facts of these four cases are sufficiently analogous to Bowker's situation to have placed all reasonable jail officials on notice that disregarding his severe symptoms amounted to a constitutional violation.[10] Each case involved the denial of medical attention to an individual in custody, and three of the plaintiffs had pre-existing medical conditions like Bowker. Olsen, 312 F.3d at 1310-11; Al-Turki, 762 F.3d at 1191; McCowan, 945 F.3d at 1280-81. Further, the medical conditions at issue in Olsen and McCowan, panic attacks and shoulder pain, were not nearly as severe as the symptoms Bowker suffered in the days leading up to his death. Given that it was clearly established in 2015 that ignoring an arrestee's shoulder pain violated the Fourteenth Amendment, Miller had notice that her deliberate indifference to Bowker's far more serious symptoms did as well. See McCowan, 945 F.3d at 1292-93.[11]

---

[10] Sealock, Olsen, and Al-Turki were all decided before Bowker's claim arose and, although McCowan was decided in 2019, the decision surveyed the state of the law in 2015, a year prior to Bowker's death.

[11] A case from one of our sibling circuits lends further support to the view that Miller violated a clearly established constitutional right. In Foelker, the Seventh Circuit reversed summary judgment in favor of a county jail and its employees on a deliberate indifference claim under circumstances very similar to this case. 394 F.3d at 510. Foelker, a pretrial detainee, received no medical attention despite defecating on himself and experiencing hallucinations because jail staff determined he was faking his

-22-

We therefore conclude that the district court erred as a matter of law in concluding that Miller did not violate a clearly established constitutional right. The district court did not consider Sealock, Olsen, or McCowan. Rather, it explained only its view that Miller did not completely deny medical care as did the defendant in Al-Turki, because she sent Bowker to the emergency room on three occasions. However, the district court failed to consider the complete denial of medical attention to Bowker's serious symptoms from June 12 until his death on June 30. The record reflects that during this period Bowker never received a medical evaluation and was not provided three of his medications, at least two of which were life-sustaining. Thus, the district court erred in determining that Miller's actions did not amount to a complete denial of medical care under Al-Turki. Bowker's constitutional right to be free from deliberate indifference to his serious medical conditions while in custody was clearly established at the time of the relevant events, and as noted above, the district court should not have granted summary judgment.

**B**

We turn next to Prince's claim against the Sheriff of Carter County in his official capacity. She alleges three distinct theories of municipal liability: failure to adequately train jail employees, failure to hire adequate medical personnel at the jail in accordance with the County's own written policy, and failure to provide timely medical services to inmates at CCJ.

---

conditions. Id. at 512. The Seventh Circuit held that a reasonable jury could conclude that the jail employees were deliberately indifferent to Foelker's serious medical need, precluding summary judgment. Id. at 513-14.

An official capacity suit "is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985) (citation omitted). Municipalities are liable under § 1983 only when the constitutional violation is caused by the municipality's policies or customs. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694-95 (1978). An unofficial policy or custom can trigger municipal liability if the practice is "so permanent and well settled as to constitute a custom or usage with the force of law . . . . [T]he actions must be persistent and widespread practices of city officials." Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996) (cleaned up). For claims involving inadequate hiring or training, as Prince brings here, the plaintiff must demonstrate that the municipality acted with deliberate indifference to the consequences of its actions. Bryson v. City of Oklahoma City, 627 F.3d 784, 788-89 (10th Cir. 2010); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 407 (1997). Once the plaintiff establishes a municipal policy or custom, she must establish that the municipality was the "moving force" behind the alleged injury. Brown, 520 U.S. at 405. "The defense of qualified immunity is available only in suits against officials sued in their personal capacities, not in suits against officials sued in their official capacities." Cox v. Glanz, 800 F.3d 1231, 1240 n.1 (10th Cir. 2015) (quotation and alteration omitted).

The district court determined that its grant of summary judgment in favor of the individually named defendants on qualified immunity grounds precluded the imposition of municipal liability. However, as we have explained, the district court erred in granting summary judgment to Miller in her individual capacity. Thus, the question before us is

-24-

whether the Sheriff has established that there are no genuine disputes of material fact and that he is entitled to judgment as a matter of law with respect to whether Carter County's policies or customs caused the violation of Bowker's constitutional rights.[12]

We conclude that he has not. Viewing the evidence in the light most favorable to Prince, a reasonable jury could find that Carter County had unofficial policies or customs of failing to medically train jail employees, inadequately staffing the jail, and delaying inmate medical attention. Further, a reasonable jury could conclude that the municipality acted with deliberate indifference to these failures and that these policies caused Bowker's death. We address each of Prince's theories of municipal liability in turn.

First, with respect to CCJ training, multiple employees testified that they received no meaningful medical training. To the extent that employees participated in training, they were administered tests on which they were encouraged to cheat using provided answer keys. Untrained staff completed booking of new inmates, meaning employees with no medical training were tasked with identifying medical conditions. Miller, the only CCJ employee with any medical background, testified that she had no training on mental health issues and was not qualified to diagnose medical conditions. According to jail employees, the Sheriff was aware of these serious deficiencies in training.

Second, the county failed to employ any medical staff other than Miller. CCJ did not employ a licensed physician, despite written policies requiring the county to do so.

---

[12] Although the district court did not address this question, this court has resolved questions of law on appeal in the first instance. See Duncan v. Gunter, 15 F.3d 989, 992 (10th Cir. 1994); Attocknie v. Smith, 798 F.3d 1252, 1259 (10th Cir. 2015); Sac & Fox Nation of Mo. v. Norton, 240 F.3d 1250, 1264 (10th Cir. 2001).

Although the Sheriff attributed the lack of a physician to the county's inability to locate qualified candidates, the record reflects limited efforts to do so.  The county delegated this task to Miller, who interviewed only two physicians.  No other efforts to employ a physician are reflected in the record, despite Miller's testimony that she encouraged the Sheriff to hire a physician.  Moreover, Miller worked only forty hours per week, meaning no medical staff were present on evenings or weekends.  The jail had a policy of contacting Miller regarding medical emergencies that arose when she was off duty, but the Sheriff was aware that Miller was frequently unresponsive and staff were hesitant to contact her for fear of reprisal.  In her absence, untrained jail guards were left to apply their own "common sense" to determine when emergent medical conditions warranted transport to the hospital.

Third, the record reflects that inmate medical attention at CCJ was routinely plagued by delays.  The jail's medication policy prohibited inmates from receiving life-sustaining medications unless they were provided in specific packaging or the inmate was transported to the emergency room, at a personal cost of $100 for the transport alone.  As a result of this policy, Bowker received no medication for close to two months after arriving at CCJ, and two life-sustaining medications were withheld from him in the days leading up to his death.  Miller, the only medical employee at the jail, regularly took at least several days to review inmate medical requests, allowing serious medical concerns to go untreated.  Testimony of a former jail employee demonstrates that the Sheriff was aware of these delays.  Against this backdrop, it is hard to avoid the conclusion that at CCJ, delay in the provision of medical services is the rule rather than the exception.

Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that CCJ maintained unofficial policies or customs of inadequate training, inadequate staffing, and delays in medical attention, often in violation of its own written policies, all as alleged in the complaint. The next inquiry is whether a reasonable jury could conclude that the municipality acted with deliberate indifference. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).

The record below reflects that the Sheriff had actual knowledge of the numerous and systemic problems with CCJ's health care system. In particular, he was aware that CCJ did not employ a licensed physician in violation of its written policy. See Tafoya v. Salazar, 516 F.3d 912, 919 (10th Cir. 2008) ("The knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." (citations omitted)). Moreover, three other CCJ inmates died in the three years prior to Bowker's death after seemingly receiving inadequate medical attention. See Barney, 143 F.3d at 1307 ("In most instances, notice can be established by proving the existence of a pattern of tortious conduct."). The Sheriff testified that the only action he took in response to Manos' death, which took place seven months prior to Bowker's death and under similar circumstances, was directing the jail administrator to ask Miller to better monitor medication logs. Former jail administrator Michael Armstrong agreed during a deposition that requiring staff without medical training to make inmate medical decisions

-27-

left CCJ's health care system "destined to fail." Given the Sheriff's knowledge of the numerous medical deficiencies at the jail, combined with the circumstances of Manos' death, a reasonable jury could determine that the Sheriff was deliberately indifferent to the risk that inmates would receive constitutionally inadequate medical attention.

Finally, a reasonable jury could conclude that CCJ's deliberate indifference caused Bowker's death. As a result of CCJ's customs and policies, Bowker failed to receive medication, experienced delays in medical treatment, and untrained staff failed to timely transport him to the emergency room in his final days. According to Prince's medical expert, there is a reasonable probability that CCJ's failure to provide continuous medical care to Bowker caused his death. We have recently held that a Sheriff's "continuous neglect" of medical conditions similar to those in this case could lead a reasonable fact finder to infer causation of a plaintiff's injury sufficient to defeat summary judgment. Burke v. Regalado, 935 F.3d 960, 1001 (10th Cir. 2019). Prince has therefore established a genuine dispute of material fact as to the Sheriff's liability. Accordingly, the Sheriff is not entitled to judgment as a matter of law.

### III

In summary, a reasonable fact finder could conclude that Wayne Bowker's tragic death resulted from both Miller's abdication of her medical duties and the Sheriff's systemic failure to address deficiencies in the provision of medical services at CCJ. To the extent that both defendants acted with deliberate indifference, they violated Bowker's constitutional right to have his medical conditions addressed urgently as a pre-trial

detainee. Because this right is clearly established in the context of Bowker's specific conditions, Miller is not entitled to summary judgment on qualified immunity grounds.

The district court's grants of summary judgment in favor of Miller in her individual capacity and the Sheriff of Carter County in his official capacity are **REVERSED**.