FILED
United States Court of Appeals
Tenth Circuit

June 18, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ANTHONY BUNTYN,

      Defendant - Appellant.

No. 23-2007

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:20-CR-00708-KWR-1)**
_____

J.K. Theodosia Johnson, Assistant Federal Public Defender (Aric G. Elsenheimer, Assistant Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, District of New Mexico, Albuquerque, New Mexico, for Defendant-Appellant.

Jonathan L. Backer, Attorney (Kristen Clarke, Assistant Attorney General, and Tovah R. Calderon, Attorney, with him on the briefs), U.S. Department of Justice, Washington, D.C., for Plaintiff-Appellee.
_____

Before **BACHARACH**, **BALDOCK**, and **KELLY**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

      This case involves inhumane conditions of confinement inflicted on pretrial detainees. The conditions developed while Mr. Anthony Buntyn

transported the detainees in a van to various detention facilities. The conditions led the government to charge Mr. Buntyn with willfully violating the detainees' rights under the Fourteenth Amendment's due process clause. *See* 18 U.S.C. § 242. Mr. Buntyn was found guilty of this charge[1] and was acquitted of two other charges.[2]

Mr. Buntyn argues that

- the evidence was insufficient for a finding of guilt,

- the district court erred in preventing his attorney from using the term *malice* in closing argument, and

- the court coerced the jury to reach a verdict.

We reject Mr. Buntyn's arguments and affirm his conviction.

**1.      Detainees describe conditions on the van.**

Mr. Buntyn worked for a private company that transported detainees for law-enforcement agencies. While working for the company, he served

---

[1]     The jury also found that the denial of due process had caused bodily injury to one of the detainees. Mr. Buntyn says in his reply brief that "[h]e did not cause bodily harm to [this detainee]." Appellant's Reply Br. at 20. But Mr. Buntyn does not develop an argument that would cast doubt on this finding.

[2]     These charges involved allegations that Mr. Buntyn had

- tased a detainee without justification and

- used intimidation and threats to discourage detainees from reporting conditions in the van.

as the officer-in-charge of a twelve-day trip across the country. At trial, two of the detainees (S.K. and W.Y.) described conditions in the van.

### A.    Limited bathroom breaks and exposure to urine

These conditions included infrequent bathroom breaks, and the inability to use the bathroom resulted in the spread of urine throughout the van. For example, S.K. testified that the van had reeked of urine, body odor, and trash. Similarly, W.Y. testified that Mr. Buntyn had ordinarily stopped for bathroom breaks only once every eight to ten hours, forcing detainees to urinate in empty water bottles while the van was moving.

### B.    Blistering heat

The conditions also included blistering heat. W.Y. testified that as they had ridden through a desert, detainees complained about the heat and Mr. Buntyn responded by blasting hot air for about twenty minutes.

### C.    Cuffing behind the back

The conditions also included cuffing the detainees' hands behind their backs.

For example, S.K. testified that

- he had complained at one stop about crowding and

- Mr. Buntyn responded by cuffing S.K.'s hands behind his back.

W.Y. testified that at a later stop, he and two others had been cuffed behind their backs. (S.K. had already been cuffed behind his back.) W.Y. explained that the four detainees had remained cuffed behind their backs

3

for at least nine hours. For that period, the four detainees had no way to urinate. According to W.Y., Mr. Buntyn later returned the cuffs to the front, but only after W.Y. and S.K. had apologized for complaining about the conditions.

### D.    The end of the trip

The van later arrived at a detention facility in Topeka, Kansas. Upon arrival of the van, a booking officer observed the detainees and said that

- they smelled of body odor, sweat, and urine and

- their clothing was wet.

## 2.    The jury finds Mr. Buntyn guilty based on inhumane conditions.

The government alleged that

- Mr. Buntyn had violated the Fourteenth Amendment's due process clause through deliberate indifference to intolerable conditions of confinement and

- this indifference had resulted in bodily injury to three detainees (A.S., W.Y., and S.K.).

The jury found Mr. Buntyn guilty of

- depriving the detainees of humane conditions,

- acting willfully and with deliberate indifference, and

- causing bodily injury to S.K.

*See* R. vol. 1, at 1431. But the jury found Mr. Buntyn not guilty of

- causing bodily injury to W.Y. or A.S. or

- tasing, intimidation, or threats.

4

*Id.* at 1431–32.

**3. We consider the sufficiency of the evidence even though the government challenges preservation.**

Mr. Buntyn challenges the sufficiency of the evidence on guilt. The government argues that Mr. Buntyn failed to preserve this challenge in his motions for a judgment of acquittal. We need not resolve this argument.

When the government rested, Mr. Buntyn moved for a judgment of acquittal, arguing that the government hadn't proven

- malice toward A.S., W.Y., or S.K. or

- bodily injury to A.S. from the conditions.

But Mr. Buntyn did not challenge the government's evidence on any other elements.

When the evidence closed, Mr. Buntyn renewed his motion for a judgment of acquittal. This time, he incorporated what he had argued earlier: "I don't have a lot to add from the last time I made this argument to the Court. I think that . . . there is insufficient evidence as a matter of law to show that Mr. Buntyn acted with malice." *Id.* at 1331.

The government points out that

- Mr. Buntyn focused in district court only on malice and on bodily injury to A.S. and

- Mr. Buntyn's appellate arguments go further.

5

But the government responded to Mr. Buntyn's motion by arguing that the evidence was sufficient not only on malice, but also on all other elements. With the benefit of the government's argument, the court found a prima facie case. Given the government's thorough discussion, the district court's finding arguably addressed all the elements. And when the court later denied the motion at the close of the evidence, the court could have been incorporating its earlier finding.

Given the government's earlier discussion, we assume (without deciding) that the district court addressed all the elements. With that assumption, we consider Mr. Buntyn's challenge on the merits irrespective of what he had argued in district court. *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 991–92 (10th Cir. 2019) ("[W]hen the district court explicitly considers and resolves an issue of law on the merits[,] . . . 'the appellant may challenge that ruling on appeal on the ground addressed by the district court even if he failed to raise the issue in district court.'" (quoting *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003))).

**4.     We consider the conditions suffered by all the detainees.**

As a threshold issue, Mr. Buntyn seeks to limit our review of the evidence given the acquittals on the counts involving bodily injury to two detainees (A.S. and W.Y.). But Mr. Buntyn doesn't say how these acquittals limit our review of the evidence.

6

The verdict against Mr. Buntyn involved two parts:

1.     He had acted with deliberate indifference and willfulness toward the conditions experienced by pretrial detainees.

2.     This conduct had caused bodily injury to S.K.

Mr. Buntyn challenges the first part of the verdict, not the second. *See* p. 2 note 1, above. But he doesn't say how these acquittals limit our review of the evidence. And he conceded in oral argument that the acquittals don't prevent us from considering the conditions experienced by all the detainees. We accept this concession and consider the evidence involving conditions affecting all the detainees.

**5.     The evidence suffices for the findings of inhumane conditions, deliberate indifference, and willfulness.**

Mr. Buntyn argues that the conviction is unsupported by the evidence.

**A.     The government needed to prove intolerable conditions, deliberate indifference, and willfulness.**

Mr. Buntyn's challenge rests on the Due Process Clause of the Fourteenth Amendment. *Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1188 (10th Cir. 2003). This clause required the government to prove that Mr. Buntyn had

- imposed conditions posing a substantial risk of serious harm to inmate health or safety, depriving detainees of the "minimal civilized measure of life's necessities" and

7

- acted with deliberate indifference to the detainees' health and safety.

*Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)); *see DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001).[3] And the criminal statute (18 U.S.C. § 242) required the government to prove that Mr. Buntyn had acted willfully. *See United States v. Lanier*, 520 U.S. 259, 264 (1997).

Mr. Buntyn argues that the government failed to prove the denial of life's necessities, deliberate indifference, or willfulness. In addressing these arguments, we view the evidence in the light most favorable to the government. *United States v. Serrata*, 425 F.3d 886, 895 (10th Cir. 2005). We can reverse only if no reasonable factfinder could have found these elements beyond a reasonable doubt. *Id.*

**B.    A rational jury could find a denial of adequate sanitation.**

The government pointed to three conditions:

1.    Unsanitary conditions from inadequate bathroom breaks

2.    Handcuffing detainees with their hands behind their backs

---

[3]    Although both *Craig* and *DeSpain* describe the standard for an Eighth Amendment violation, this amendment provides "the benchmark" for due process claims. *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998); *see also Blackmon v. Sutton*, 734 F.3d 1237, 1244 (10th Cir. 2013) (stating that Eighth Amendment case law for deliberate indifference applies in the Fourteenth Amendment context because "detention center officials surely owe pretrial detainees . . . at least the same standard of care prison officials owe convicted inmates").

3.      Blasting the heat when the van was already hot

At trial and on appeal, the government urged consideration of these conditions in combination with one another. In closing argument, for example, the government said that it did "not have to prove the specific way the detainees would be harmed." R. vol. 2, at 1385. The instructions followed a similar approach, allowing the jury to consider "whether the presence of multiple conditions of confinement may have combined to create an environment that, as a whole, posed a substantial risk of serious harm to health and safety." R. vol. 1, at 1405. On appeal, the government takes the same approach.

But our precedent doesn't allow courts to combine unrelated conditions. Under our precedent, we must determine whether Mr. Buntyn deprived the detainees of "a single, identifiable human need." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). We can combine the conditions only if they "mutually enforc[ed]" each other to deprive a detainee of a single human need, such as sanitation. *Id.*

Though the government points to various deprivations, we focus on the unsanitary conditions in the van. These conditions involved exposure to urine from the infrequency of bathroom breaks. For example, W.Y. testified that

9

- he had needed to urinate in a bottle at least 20–30 times[4] and

- the urine had spilled onto the floor and W.Y.'s clothes because he needed to urinate while handcuffed and shackled in a moving van.

Similarly, S.K. testified that it was hard to urinate in bottles because the detainees were restrained in the dark and the van was moving.[5] W.Y. added that Mr. Buntyn had rejected requests from a female detainee to stop for a bathroom break. Without a bathroom break, the female detainee had to urinate on the floor.

The sparsity of bathroom breaks is also reflected in Mr. Buntyn's activity log for the trip. The activity log shows stops for food, fuel, and

---

[4]    W.Y. also testified that all of the male detainees had to urinate into bottles because of the infrequent bathroom breaks.

[5]    S.K. also testified that he

- had struggled with leg wounds and

- had feared an infection like MRSA.

Mr. Buntyn questions this testimony, arguing that (1) the leg wounds didn't prevent him from boarding the bus and (2) no other detainee got a MRSA infection. But S.K. didn't suggest that his leg wounds would have prevented travel. He instead testified that he had feared an infection from the combination of open wounds and unsanitary conditions. The jury could credit these fears whether or not anyone else had contracted MRSA.

bathroom breaks. In one period of 36-½ hours, these records show no bathroom stops.[6]

Mr. Buntyn argues that these periods were short and involved only urine, not feces. We reject both arguments.

The duration of the condition is often critical. *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001). S.K. sat in the van for over 57 hours; W.Y. and A.S. sat there even longer. These periods were long enough for the jury to regard the shortage of bathroom breaks as intolerable. In fact, we've held that the conditions violated the Constitution when prisoners had been housed for

- 3 days in a cell covered with feces[7] and

---

[6]    Mr. Buntyn testified that the activity log should also have shown bathroom breaks

- after 22-½ hours,

- after 1 hour and 35 minutes,

- after 2 hours and 45 minutes, and

- at 6 hours.

But even if the jury had credited this testimony, a rational jury could find a denial of adequate sanitation from the 22-½ hour interval.

[7]    *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001).

- 1-½ days in a cell with urine and feces in standing water.[8]

Similarly, the Eleventh Circuit has found constitutional violations when a prisoner couldn't use a bathroom during a 600-mile trip[9] or a stretch of 6 to 7 hours.[10]

**C.    A jury could find deliberate indifference and willfulness.**

The government bore the burden of proving not only inhumane conditions, but also deliberate indifference and willfulness. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (deliberate indifference); 18 U.S.C. § 242 (willfulness). The jury could reasonably find satisfaction of that burden.

Mr. Buntyn's indifference would be considered *deliberate* only if he

- was aware of facts that could trigger an inference of a substantial risk of serious harm and

- drew that inference.

*Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006). An action is *willful* when it is taken "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." *Screws v. United States*, 325 U.S. 91, 105 (1945).

In arguing that there was enough evidence of deliberate indifference and willfulness, the government points to inadequate bathroom breaks, the

---

[8]    *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001).

[9]    *Bilal v. GeoCare*, 981 F.3d 903, 914 (11th Cir. 2020).

[10]    *Berkshire v. Dahl*, 928 F.3d 520, 538 (11th Cir. 2019).

handcuffing of detainees with their hands behind their backs, and the blasting of heat. But under our precedent, the government must show that Mr. Buntyn was deliberately indifferent to "a single, identifiable human need." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)); *see DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) (stating that officials must be deliberately indifferent to "any risk inherent in exposure to the challenged conditions"); *see also* p. 9, above. So we must separately consider deliberate indifference and willfulness for each condition regarded as intolerable. *See Shannon v. Graves*, 257 F.3d 1164, 1168–69 (10th Cir. 2001) (separately analyzing the subjective component for each alleged deficiency).

We earlier focused on the unsanitary conditions resulting from inadequate bathroom breaks. *See* pp. 9–12, above. So we again focus on these conditions when considering the evidence of deliberate indifference and willfulness. That evidence involved Mr. Buntyn's

- knowing violation of his company's policies and

- punishment of detainees when they complained.

First, a jury could consider violations of company policy in finding deliberate indifference and willfulness. *See Burwell v. City of Lansing*, 7 F.4th 456, 475–76 (6th Cir. 2021) (concluding that a defendant's violation of a jail policy constituted evidence of deliberate indifference); *Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (same). For example,

13

Mr. Buntyn's employer generally required bathroom breaks at least every four hours "when possible." Supp. R. vol. 1, at 487. If Mr. Buntyn couldn't provide these breaks every six hours, he needed to inform the company. *Id*. Despite this policy, the government presented evidence that Mr. Buntyn

- had repeatedly made the detainees wait more than four hours between bathroom breaks and

- had not reported any of these incidents to the company.

Mr. Buntyn insists that he could stop only at detention facilities or when he had backup from law enforcement. But S.K. testified that Mr. Buntyn had eventually let the detainees get out of the van at gas stations and smoke cigarettes. S.K. told the jury that the new leniency suggested that Mr. Buntyn had been "trying to make up for something." R. vol. 2, at 653. Regardless of Mr. Buntyn's motive, however, this leniency could cast doubt on his explanation for the infrequency of bathroom stops.[11]

The government also presented another employee's testimony that when he drove detainees through areas without detention facilities, he

---

[11]    In his reply brief, Mr. Buntyn argues that the jury disbelieved S.K.'s testimony that the greater leniency later in the trip showed an intent to discourage complaints. For this argument, Mr. Buntyn relies on the acquittal involving the charge of intimidating or threatening witnesses. For this charge, however, the district court instructed the jury that an element involved intimidation or threats. The jury could have credited S.K.'s testimony about the additional stops without regarding them as intimidation or threats.

- would get local law-enforcement officers to help watch the detainees during bathroom breaks at local gas stations and

- had never required detainees to wait more than six hours for a bathroom break.

That testimony supported a finding that Mr. Buntyn had deliberately and willfully deprived detainees of adequate sanitation, making them urinate in bottles while the van was moving.

The government also presented evidence of policy violations involving cuffing detainees behind their backs. These violations reinforced the lack of sanitation, for S.K. and W.Y. testified that they could not urinate in water bottles while cuffed behind the back.

The company had a policy that generally prohibited handcuffing a detainee behind the back for longer than four hours. Regardless of the duration, however, officers-in-charge needed to inform the company and check the detainees every fifteen minutes. In addition, officers-in-charge needed to tell the company about any deviations from its policies.

The government presented evidence that Mr. Buntyn had violated these policies. For example, S.K. testified that he had once been cuffed behind his back from 11 a.m. to dusk. W.Y. similarly testified that Mr. Buntyn had cuffed the hands of 4 detainees behind their backs for at least 9 hours.

15

The government also showed the activity log, which contained no mention of these incidents.[12] And a company trip manager testified that he couldn't recall any reports from Mr. Buntyn about policy deviations during the trip.[13] These violations of company policy support a finding that Mr. Buntyn had deliberately and willfully caused unsanitary conditions.

Second, a jury could reasonably infer deliberate indifference and willfulness from Mr. Buntyn's punitive responses to complaints. For example, at one stop in Arizona, S.K. complained to guards about conditions in the van. S.K. testified that before he could reenter the van, he was cuffed behind his back and put in a segregation cage. The segregation cage smelled of urine, creating discomfort for S.K. And with his hands

---

[12]     In his reply brief, Mr. Buntyn argues that another employee made mistakes when completing the activity log. For support, Mr. Buntyn cites testimony that he had been sleeping when another employee was supposed to record a bathroom break. But Mr. Buntyn was not sleeping when he cuffed the four detainees behind their backs, and he doesn't explain why he failed to record this incident in the activity log.

[13]     In his reply brief, Mr. Buntyn points to testimony about a report summarizing the company's internal investigation. The report stated that Mr. Buntyn had communicated with the trip manager. But the jury could reasonably

- reject this testimony and

- rely instead on the testimony of the trip manager.

By relying on this testimony, the jury could reasonably find a failure to tell the company about the (1) infrequency of bathroom breaks and (2) incidents where Mr. Buntyn had cuffed detainees behind their backs.

16

cuffed behind his back, S.K. could not urinate in bottles. Mr. Buntyn's punitive response suggests indifference to the unsanitary conditions.

In New Mexico, Mr. Buntyn also responded punitively to complaints. After the detainees had complained to guards about the conditions, Mr. Buntyn cuffed S.K.'s hands behind his back. Mr. Buntyn also tried to cuff W.Y.'s hands behind his back. W.Y. resisted, telling Mr. Buntyn that the pain would be excruciating because he had shoulder injuries and was still recovering from a heart attack. Minutes later, the van stopped and Mr. Buntyn cuffed the hands of W.Y. and two other detainees behind their backs. W.Y. pleaded with Mr. Buntyn, complaining again about his shoulder injuries and recent heart attack. But Mr. Buntyn admittedly went ahead and cuffed W.Y. behind the back.

From Mr. Buntyn's violations of company policy and his responses to the detainees' complaints, a jury could reasonably find that Mr. Buntyn had recognized a substantial risk of harm to the detainees and openly defied the need for sanitation. So the evidence sufficed for findings of deliberate indifference and willfulness.

**6.    The court didn't err in prohibiting use of the term *malice* in closing argument.**

The jury instructions used the term *willfulness*, but not *malice*. Nonetheless, Mr. Buntyn's attorney said that he wanted to use the term *malice*. The court regarded *malice* as a term of art, bearing a meaning that

differs from *willfulness*. So the court prohibited counsel from using *malice* in closing argument. Mr. Buntyn argues that this prohibition violated his right to present a defense. The district court rejected this argument, and we conduct de novo review. *United States v. Solomon*, 399 F.3d 1231, 1239 (10th Cir. 2005).

The Fifth and Sixth Amendments guarantee criminal defendants the right to present a defense. *United States v. Markey*, 393 F.3d 1132, 1135 (10th Cir. 2004). But this right isn't absolute. *United States v. Rivas-Macias*, 537 F.3d 1271, 1277 (10th Cir. 2008). For example, this right doesn't prevent reasonable limitations on the terminology in closing argument. *See Herring v. New York*, 422 U.S. 853, 862 (1975) (stating that the right to present a defense doesn't prevent limitations on closing argument).

Mr. Buntyn's attorney could and did present a defense, and his closing argument advanced that defense. For example, the attorney argued that the jury should vote *not guilty* if Mr. Buntyn had acted out of fear, negligence, bad judgment, or accident.

Mr. Buntyn insists that his attorney wanted to use the term *malice* rather than *willfulness*. But Mr. Buntyn doesn't show why the attorney needed to use the particular term *malice*.

Mr. Buntyn argues that

18

- his proposed jury instruction on *willfulness* drew a contrast with *bad judgment* and

- a juror had said in voir dire that he equated *bad purpose* with *malice*.

But the district court rejected this proposed instruction and never used the term *bad purpose*. So Mr. Buntyn hasn't shown why the attorney needed to use the particular term *malice*. Though the attorney couldn't use this particular term, she could have used various synonyms of *malice*, such as *ill will*, *evil intent*, *malevolence*, *animosity*, *antagonism*, or *hardheartedness*. *Malice*, *The Random House Thesaurus* (1987). Given the chance to use multiple synonyms of *willfulness*, the district court didn't prevent assertion of a defense by prohibiting use of the particular term *malice*.[14]

## 7.   Mr. Buntyn waived his challenge to the district court's instruction for the jury to continue deliberating.

Finally, Mr. Buntyn challenges an instruction given by the district court as the jury was deliberating. Some jurors were apparently staying in

---

[14]   In his reply brief, Mr. Buntyn says that the ruling deprived him of "assistance of counsel." Appellant's Reply Br. at 20. But Mr. Buntyn doesn't develop an argument involving lack of counsel. In his opening brief, he based the claim on an inability to assert a defense rather than a deprivation of legal assistance.

a hotel because they lived out of town.[15] Before the last day of the trial, the judge

- suggested to the jurors that they might want to check out of their hotel before their next trial day and

- consult the jury clerk if they had any questions about the hotel arrangements.

The next trial day, the jurors began deliberating at about noon. After deliberating for about seven hours, the jurors asked the judge what they should do if they couldn't reach a unanimous verdict. The judge responded by instructing the jury to keep deliberating. Mr. Buntyn did not object to the instruction, and the jury returned a verdict over three hours later.

Mr. Buntyn argues that this instruction coerced the jurors by failing to tell them that they could pause their deliberations and resume the next day. But Mr. Buntyn did not preserve an objection to the jury instruction. We would thus ordinarily deem the issue forfeited, reviewing Mr. Buntyn's appellate argument under the standard for plain error. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). But Mr. Buntyn hasn't urged

---

[15]     The record does not say how many jurors stayed at the hotel. Mr. Buntyn infers that one juror stayed at the hotel because he lived roughly 185 miles from Albuquerque, where the trial was held.

plain error. The failure to urge plain error results in waiver, so we don't address Mr. Buntyn's new appellate argument. *Id.*[16]

## 8.    Conclusion

We therefore affirm Mr. Buntyn's conviction.

---

[16]    Even if we were to review the issue under the plain-error standard, Mr. Buntyn's appellate argument would fail. Under the plain-error standard, we could reverse only if Mr. Buntyn had shown

- the existence of an obvious error and

- an effect on his substantial rights.

*United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005).

Mr. Buntyn failed to show an obvious error or an effect on his substantial rights. He suggests that the court should have told the jury that it could pause the deliberations until the next day. But the jury hadn't suggested a desire to pause the deliberations. So any possible error wouldn't have been obvious.

Nor would there have been an effect on Mr. Buntyn's substantial rights. He speculates that the out-of-town jurors might have worried about the availability of a hotel room if they had reached an impasse and wanted to stop deliberating for the night. But there's no support for this speculation. The court said that

- it "certainly [would] not . . . rush" the decision and

- the jurors should consult the jury clerk about the possibility of checking out of their hotel rooms.

R. vol. 2, at 1330. Given these statements, Mr. Buntyn hasn't shown why the jurors would have thought they needed to rush a verdict in order to have a place to stay overnight. So even if an obvious error had existed, it wouldn't have been prejudicial.