**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JONATHAN ARVAY,

    Defendant - Appellant.

No. 24-1497
(D.C. No. 1:23-CR-00222-GPG-2)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, Chief Judge, **BACHARACH** and **MORITZ**, Circuit Judges.
_____

A jury convicted Jonathan Arvay of conducting an illegal gambling business and conspiring to do the same. Arvay challenges three jury instructions on appeal, primarily contending the district court erred by not instructing the jury that to convict, it needed to find that Arvay knew his acts were ones "of participation in gambling." *United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir. 1997). We affirm Arvay's convictions because the district court's instructions were correct. And even if we were to conclude otherwise, the purported errors did not affect the jury's verdict given the strength of the government's evidence at trial.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

## Background

In 2021, the FBI and IRS began investigating illicit gambling establishments across Colorado, all linked to a man named Nathan Sugar. The establishments shared common characteristics, one of which was allowing players to obtain cryptocurrency as a prize for playing games. Arvay co-owned one of these establishments: Player One Arcade in Denver.

In January 2022, Joseph Fiedler, an FBI task-force officer, visited Player One in an undercover capacity. A second undercover FBI agent accompanied him. The pair approached Arvay and inquired about playing games at the arcade. Arvay explained that the agents could earn points by playing games and then trade the points for prizes, including a cryptocurrency called odacoin. Arvay informed the agents that he could not give cash payouts because that would be "gambling," and he could not "do that . . . in the city of Denver." Fiedler Body-Worn Camera Footage, 03:27–03:30. But, Arvay clarified, the agents could take the cryptocurrency prize to the business next door and exchange it for cash there.

The business next door, however, was a "tiny little room" containing a cryptocurrency teller machine (CTM) that allowed users to trade odacoin for cash. R. vol. 8, 73. There were instructions above the CTM that advised users experiencing issues with the machine to call Player One. And Arvay maintained the machine: he cleared, and elicited help in clearing, CTM jams, he tried to keep the CTM filled with fives and twenties, and he instructed employees on recording information from the CTM.

2

As part of their investigation, the agents played some of the games at Player One. When the agents redeemed their points, Arvay directed them to the CTM and gave Fiedler a handwritten card with login credentials to access the machine. Fiedler exited Player One, entered the CTM room, and obtained cash from the CTM.

In July 2023, a grand jury charged Arvay in a superseding indictment with one count of conducting, financing, managing, supervising, directing, or owning all or part of an illegal gambling business, in violation of 18 U.S.C. § 1955, and one count of conspiring to do the same, in violation of 18 U.S.C. § 371.[1] A jury convicted Arvay on both counts, and the district court sentenced him to a year and a day in prison, plus three years of supervised release. Arvay appeals his convictions.

## Analysis

Arvay challenges three jury instructions: the elements instruction for the illegal-gambling-business count, including the instruction's definition of "gambling"; the "knowingly" instruction; and the elements instruction for the conspiracy count. "We review jury instructions as a whole 'de novo in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.'" *United States v. Flechs*, 98 F.4th 1235, 1250–51 (10th Cir. 2024) (quoting *United*

---

[1] The indictment also charged Sugar and one other individual with a variety of crimes. Sugar remains a fugitive, and the other individual reached a diversion agreement with the government. The indictment also named, but did not charge, four other coconspirators, some of whom reached prosecution-protection agreements with the government.

*States v. Jean-Pierre*, 1 F.4th 836, 846 (10th Cir. 2021)). When an appellant preserves their objection to a district court's decision to give, or refuse to give, a particular instruction, we review for abuse of discretion. *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008). "A district court abuses its discretion when its decision is arbitrary, capricious[,] or whimsical or falls outside the bounds of permissible choice in the circumstances." *United States v. Woodmore*, 127 F.4th 193, 209 (10th Cir. 2025) (cleaned up) (quoting *United States v. Olea-Monarez*, 908 F.3d 636, 639 (10th Cir. 2018)).

But our inquiry into preserved instructional errors doesn't end there. When a district court instructs the jury incorrectly, we review for harmless error. *United States v. Kahn*, 58 F.4th 1308, 1317–18 (10th Cir. 2023). The government bears the burden of showing harmlessness, *United States v. McGirt*, 71 F.4th 755, 760 (10th Cir. 2023), but the applicable harmlessness standard "depend[s] upon whether the error is of constitutional dimension," *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). For constitutional errors, we ask whether "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *McGirt*, 71 F.4th at 760 (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)). For nonconstitutional errors, we consider whether the error "had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *Rivera*, 900 F.2d at 1469 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

For unpreserved instructional objections, appellants must meet our stricter

4

plain-error test. *United States v. Buntyn*, 104 F.4th 805, 814 (10th Cir. 2024); *see also United States v. Brown*, 128 F.4th 1358, 1366 (10th Cir. 2025) (stating appellant bears burden). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Paycer*, 154 F.4th 1261, 1271 (10th Cir. 2025) (quoting *United States v. Frost*, 684 F.3d 963, 971 (10th Cir. 2012)), *cert. denied*, No. 25-6953, 2026 WL 1052080 (Apr. 20, 2026).

Arvay first challenges the instruction setting out the elements of conducting an illegal gambling business in violation of § 1955. Broadly, this instruction listed the three elements of the offense, defined the terms "conduct" and "gambling," explained the government's burden of proof regarding knowledge, and provided the relevant Colorado gambling law. For context, we set out most of the instruction here:

> To find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> *First*:    The defendant and four or more persons knowingly conducted, financed, managed, supervised, directed, or owned all or part of a gambling business;
>
> *Second*:    The gambling business was conducted in, and violated the law of, the state of Colorado . . . ; and
>
> *Third*:    The gambling business either was in substantially continuous operation for more than 30 days or had a gross revenue of $2,000 or more on any single day.
>
> A person "conducts" a gambling business if he participates in the operation of the gambling business in some function necessary to the operation of the gambling business. A mere bettor or customer is not involved in the "conduct" of the business.

5

The government is not required to prove that the defendant knew the gambling business involved five or more people, had a gross revenue of $2,000 or more on any single day, or remained in operation for more than 30 days. The government is also not required to prove that the defendant knew that the gambling business violated Colorado law.

[Elements of Colorado law from Colo. Rev. Stat. § 18-10.5-102 and -103, relevant to the second element above, including the definition of a "simulated gambling device."]

. . . .

"Gambling" means risking any money, credit, deposit, or other thing of value for gain contingent in whole or in part upon lot, chance, the operation of a gambling device, or the happening or outcome of an event, including a sporting event, over which the person taking a risk has no control.

R. vol. 1, 441–42.

Although this instruction is consistent with our pattern instruction, *see* Tenth Cir. Crim. Pattern Jury Instrs. § 2.72 (2023), Arvay challenges the instruction's presentation of the required mens rea. As quoted above, the instruction states that a defendant need not know that his conduct violated Colorado law. But according to Arvay, this is incomplete because the district court should have also instructed the jury that the government needed to prove Arvay knew his "act was one of participation in gambling." *O'Brien*, 131 F.3d at 1430. The parties dispute whether Arvay presented this objection to the district court and preserved the issue for appeal. But we need not decide preservation because Arvay's argument fails under any standard of review.

In *O'Brien*, we discussed the mens rea requirement for a § 1955 conviction in

the context of a sufficiency challenge. *Id.* at 1429–30. We observed that § 1955 is not a specific-intent statute, which means "a defendant need not know that the gambling business involved five or more people, remained in operation for thirty days, or was violative of state law." *Id.* at 1430. Instead, the statute requires a general intent, "which is satisfied whenever the defendant knowingly does an act made unlawful by the statute." *Id.* We noted, however, that "[t]o say that the statute requires knowledge . . . does not answer the 'question of what level of knowledge suffices.'" *Id.* (cleaned up) (quoting *Staples v. United States*, 511 U.S. 600, 621 (1994) (Ginsburg, J., concurring)). Thus, we clarified that "the government must demonstrate that a defendant knew that his . . . act was one of participation in gambling." *Id.* We found that requirement satisfied in *O'Brien* by evidence that the defendants "*knowingly* conducted, financed, managed, supervised, directed, or owned all or a part of the . . . gambling business." *Id.* (emphasis added).

Here, the district court instructed the jury that to convict Arvay of conducting an illegal-gambling-business, it needed to find that Arvay "*knowingly* conducted, financed, managed, supervised, directed, or owned all or part of a gambling business." R. vol. 1, 441 (emphasis added). Simply put, this instruction directly aligns with *O'Brien's* articulation of the level of knowledge required for a § 1955 offense. *See O'Brien*, 131 F.3d at 1430.

Moreover, the instructions capture the additional language in *O'Brien* that Arvay argues the district court should have included—"that [Arvay] knew that his . . . act was one of participation in gambling." *O'Brien*, 131 F.3d at 1430. In the very

7

same instruction, the district court instructed the jury that "conducts" means participating in the operation of a gambling business "in some function necessary to the operation of the gambling business." R. vol. 1, 441. So to find that Arvay "knowingly conducted" the gambling business, the jury would necessarily have to conclude that he knowingly participated in the operation of the business in an essential capacity. For these reasons, the district court did not abuse its discretion or plainly err in instructing the jury on the illegal-gambling-business count.[2]

Arvay relatedly relies on *O'Brien* to challenge the district court's "knowingly" instruction, which stated:

> When the word "knowingly" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident. Although knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact. Knowledge can be inferred if the defendant was aware of a high probability of the existence of his participation in a business that *had the features making it a gambling business, unless the defendant did not actually believe he was participating in a business that had those features*.

---

[2] Arvay also argues that the district court should have instructed the jury that the definition of "gambling" in this instruction does not include a game of skill. But the statute and pattern instruction that Arvay relies on don't apply in this case, which involves not straightforward gambling but simulated gambling devices. *Compare* Colo. Rev. Stat § 18-10-102(2)(a) (excluding "[b]ona fide contests of skill" from definition of "gambling"), *and* Colo. Jury Instrs. Crim. § F:160.2 (2023) ("'Gambling' does not include[] bona fide contests of skill . . . ."), *with* Colo. Rev. Stat. § 18-10.5-102(3.5) (stating "that, for purposes of [the definition of gambling as used in 'simulated gambling' or 'simulated gambling device'], the exception set forth in [§] 18-10-102(2)(a) does not apply"), *and* Colo. Jury Instrs. Crim. § F:160.25 (2023) (excluding "bona fide business transactions" but not games of skill from definition of "gambling" for purposes of simulated-gambling-device offense). So there is simply no error on this basis.

*Id.* at 445 (emphasis added). This instruction is also consistent with our pattern instruction. *See* Tenth Cir. Crim. Pattern Jury Instrs. § 1.37 (2023). Nevertheless, Arvay contends that the italicized language is at odds with *O'Brien* because it "allowed the jury to find lack of knowledge only if Arvay did not believe 'he was participating in a business that had . . . features [of a gambling business].'" Aplt. Br. 19 (quoting R. vol. 1, 445). Arvay also contends that the language allowed the jury to infer knowledge if Arvay was aware of the existence of his participation in a business that had features making it a gambling business, whereas *O'Brien* requires that a defendant know that their act was one of participation in gambling. Neither argument establishes any error.

As the government recognizes, the challenged language identified one instance where the jury could *infer knowledge*. The instruction did not identify the *only* instance where the jury could find that Arvay *lacked knowledge*. Further, we discern no difference between a defendant's knowledge that they were participating in a business that had features making it a gambling business and their knowledge that their act was participation in gambling. So the "knowingly" instruction was not erroneous.

But even if the district court erred in instructing the jury on mens rea or the definition of knowingly, the errors were harmless.[3] The government presented

---

[3] Though the parties do not thoroughly analyze whether the purported errors were constitutional or nonconstitutional, we need not decide this issue because the errors were harmless even under the stricter test for constitutional errors.

evidence that placed Arvay's knowledge that he was participating in gambling beyond a reasonable doubt. Arvay recognized what constituted gambling: he told the undercover agents that he could not "give out any cash payouts ever" because that would be "gambling," which he could not do "in the city of Denver." Fiedler Body-Worn Camera Footage, at 03:24–03:30. Yet Arvay offered cryptocurrency as an arcade prize and told the agents that they could exchange the cryptocurrency for cash at the CTM next door. And Arvay's statement that the CTM was its own business is controverted by overwhelming evidence: he had access to the CTM and maintained it, wrote out the username and password necessary for Fiedler to access the CTM, cleared CTM jams himself or asked for help in clearing them, instructed an employee on recording information from the CTM, and tried to keep the CTM full of cash. Further, a notice above the CTM instructed users to call Player One if they experienced issues. In sum, the evidence revealed that Arvay knew giving customers cash as a prize would be illicit gambling, but he did so anyway by offering cryptocurrency as a prize and facilitating cryptocurrency-to-cash exchanges through the CTM. On these facts, we are certain beyond a reasonable doubt that the purported errors did not contribute to the jury's verdict on count one and were therefore harmless.

As a final matter, Arvay challenges the elements instruction for the conspiracy count, arguing that the alleged errors on the illegal-gambling-business and knowingly instructions tainted the conspiracy instruction. As above, we need not decide whether Arvay preserved this challenge because it fails under any standard. There were no

errors on the illegal-gambling-business and knowingly instructions, as we have already explained, that could have carried over to the conspiracy instruction. Thus, the district court did not err in giving the conspiracy instruction.

## Conclusion

Arvay fails to show that the district court's instructions were erroneous, and any purported errors were harmless beyond a reasonable doubt. We affirm.

Entered for the Court


Nancy L. Moritz
Circuit Judge